**RESERVOIR SYSTEMS, INC. and Axel Sigmar, Appellants,**

v.

**TGS–NOPEC GEOPHYSICAL CO., L.P., Appellee.**

No. 14–09–00528–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 9, 2010.

Rehearing En Banc Overruled Dec. 9, 2010.

Tanya Nicole Garrison, Jonathan David Saikin, Houston, for Appellants.

James McBride, Scott R. McLaughlin, D. Elaine Conway, Maryellen Shea, Houston, for Appellee.

Panel consists of Justices BROWN, SULLIVAN, and CHRISTOPHER.

## OPINION

JEFFREY V. BROWN, Justice.

The appellee, TGS–NOPEC Geophysical Co., L.P. ("TGS") sued the appellants, Reservoir Systems, Inc., and Reservoir's president and owner, Axel Sigmar, for breach of contract and fraud arising out of a failed business venture. Reservoir asserted counterclaims. After a bench trial, the trial court found in TGS's favor and ordered that TGS recover $5 million on its breach-of-contract claim against Reservoir and $735,000 on its fraud claim against Sigmar. On appeal, Sigmar challenges the legal and factual sufficiency of the evidence supporting the fraud finding and contends that, because TGS's only injury was the economic loss of the contract, TGS's claim sounds in contract alone, not tort. Reservoir does not challenge the breach-of-contract finding against it, but does contend on appeal that the trial court erred by excluding all evidence of damages on its counterclaims against TGS. For the reasons explained below, we affirm.

## I

TGS records and processes geophysical seismic data, primarily offshore, and sells the data to oil and gas companies. Sigmar, in addition to being the president and owner of Reservoir, also was a shareholder of Reservoir Systems International S.A. de C.V. ("RSM"), a Mexican company. Some years before 2006, Sigmar began pursuing a series of potentially lucrative "direct award" contracts between RSM and Pemex, Mexico's national petroleum company. The contracts were to provide advanced seismic technologies to Pemex to allow it to gather survey information for Pemex's producing wells in Mexico. TGS was intrigued by Sigmar's ability to obtain a direct-award contract with Pemex and was looking for an opportunity to develop contacts that would enable it to conduct business in Mexico. In April 2006, TGS began discussing a business arrangement with Sigmar.

Initially, TGS considered acquiring an equity position in the project, but eventually decided to loan Reservoir $5 million instead. The loan, dated May 5, 2006, was

secured by a promissory note. The loan's purpose was to help Reservoir obtain a $30–million loan from Alliance Capital to finance the Pemex project, including obtaining a source vessel from which the seismic data would be gathered.[1] TGS also located and arranged for a source vessel and provided consulting services. Sigmar had told TGS that he was very close to arranging the $30 million in financing from Alliance Capital. Based on Sigmar's representations, TGS believed that its loan was needed for Sigmar to finally attain the additional financing. Ultimately, however, Sigmar failed to secure this financing.

The project began to stall when vendors were not paid for their services. In September, before the start of operations, TGS notified Reservoir that it intended to call the loan. Reservoir did not repay the loan on the due date. TGS attempted to salvage the project through meetings with vendors, RSM's shareholders, and others who wanted Sigmar to relinquish operational and financial control, but Sigmar would not agree. The project remained undercapitalized, and eventually TGS decided not to invest any more money in it. Pemex later sued RSM to rescind the contract.

Kim Abdallah, the vice president of business development at TGS, testified at trial that TGS relied on Sigmar's representations when it decided to invest in the Pemex project. Among other things, Sigmar represented that he had strong ties with well-connected individuals in Pemex and the Mexican government. According to Sigmar, the brother of Mauricio Mireles,

one of RSM's shareholders, had worked at the treasury department in customs and was going to provide important guidance regarding importation problems.[2] The principal of another shareholder, Erwin Larranaga, was in law enforcement and national security and was expected to provide protection for the equipment. TGS was interested in obtaining access to Sigmar's contacts and would not have participated in the Pemex project or loaned Reservoir $5 million but for Sigmar's contacts. But by November 2006, the shareholders had filed a lawsuit in Mexico disputing Sigmar's authority as president of RSM.

Sigmar also represented that he had strong relationships with an "alliance" of companies that were purportedly already committed to perform the services required. The alliance supposedly included, among others, Paulsson Geophysical Services, Inc. ("Paulsson"). Paulsson owned a trademarked technology known as "Massive 3D VSP," which Sigmar claimed to have permission to use. This representation was reflected in Sigmar's PowerPoint presentation to TGS as well as in a services agreement between RSM and Reservoir. Additionally, the stated purpose of the July 2006 Pemex contract was for RSM to "obtain and process data from massive 3D seismic vertical profiles in the marine or inland areas, using Massive 3D VSP technology, for the assets of [Pemex]." TGS relied on Sigmar's representation that Paulsson was involved in the project when it decided to invest. Contrary to this representation, however, Sigmar was not authorized to provide Paulsson's technology.[3]

---

1. A source vessel is a ship outfitted with seismic equipment used in offshore seismic surveys.

2. The three shareholders in RSM were Tao Technologies, Oceantech, and Carlos Mireles. Sigmar owns ninety-five percent of Tao Tech-

nologies. Erwin Larranaga owned Oceantech.

3. In a May 2006 letter, Paulsson's president, Bjorn Paulsson, wrote to Sigmar, "You and [Reservoir] have not had, do not have, and

The loan agreement between TGS and Reservoir expressly provided that Reservoir was not to use the loan proceeds for any purpose other than "securing and servicing the Pemex contract." Abdallah testified that the purpose of the loan was to "engage the operations going forward," such as obtaining the source vessel and paying for a performance bond. When Reservoir received the loan, Sigmar conveyed $2 million of it through Tao Technologies to RSM.[4] Sigmar testified that RSM then sent some of the $2 million back to Reservoir to pay expenses incurred before the loan was made. Sigmar also testified that some of the outstanding invoices were from Sigma Research & Development, a company Sigmar owned. Sigma Research then paid some of the money received from Reservoir to Sigmar for expenses predating the loan. According to Sigmar, these expenses included repayment of loans he had made to Sigma Research and for his salary. Sigmar also testified that some of the money was transferred from Reservoir to Maribel Properties, another company he owned, to cover Reservoir's back rent. Sigmar admitted that about $735,000 found its way into an account apparently for his personal use.

Abdallah testified that TGS would not have made the loan if it had known that Sigmar was not going to use all of it to secure and service the Pemex contract; nor would it have done so if it knew Sigmar was going to pay himself "over $900,000" of the loan proceeds.

## II

▮ Sigmar first contends the evidence is legally and factually insufficient to support the trial court's finding that he committed fraud. To demonstrate fraud or fraudulent inducement, TGS was required to show that (1) Sigmar made a material misrepresentation to TGS, (2) the representation was false and Sigmar knew it was false when it was made or he made it without knowledge of its truth, (3) Sigmar made the representation with the intention that TGS act on it, (4) TGS acted in reliance on it, and (5) the representation caused TGS injury. *Formosa Plastics Corp., USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex.1998). Fraudulent inducement is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. *Haase v. Glazner*, 62 S.W.3d 795, 798–99 (Tex.2001).

## A

A trial court's findings are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing evidence supporting a jury's answer. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994); *CA Partners v. Spears*, 274 S.W.3d 51, 69 (Tex.App.-Houston [14th Dist.] 2008, pet. denied.). If there is more than a scintilla of evidence supporting a finding of fact, we will overrule a legal-sufficiency challenge. *CA Partners*, 274 S.W.3d at 69. In reviewing a factual-sufficiency challenge, we consider all of the evidence and will set aside a finding only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.*

will not in the future have any authority to commit [Paulsson] to any business." Paulsson sued Sigmar in a Texas federal court in December 2006 and the court ordered Sigmar and Reservoir to cease using the phrases "P/GSI" and "Massive 3D VSP." The court also ordered Sigmar to send a letter to Pemex stating that Reservoir had been sued by Paulsson and did not have authority to provide Massive 3D VSP.

4. Sigmar testified the remaining $3 million was put in a money-market fund.

When, as here, the trial court files no findings of fact or conclusions of law, the trial court's judgment implies all findings of fact necessary to support it. *Pharo v. Chambers County,* 922 S.W.2d 945, 948 (Tex.1996). But when a reporter's record is filed, these implied findings are not conclusive and may be challenged for legal and factual sufficiency. *See Roberson v. Robinson,* 768 S.W.2d 280, 281 (Tex.1989) (per curiam).

### B

Sigmar contends there are two specific bases for the trial court's fraud finding: (1) the allegation in TGS's petition that Sigmar represented that the loan was to be used for securing and servicing the Pemex contract; and (2) the trial court's determination that Sigmar fraudulently used some of the money to pay himself back.[5] Sigmar then contends the evidence is legally and factually insufficient to support either theory.

In its live pleading, TGS alleged the following:

Sigmar made false representations that TGS–NOPEC relied upon to its detriment before entering into the Loan Agreement and Promissory Note. Specifically, Sigmar misrepresented that he had disclosed all material facts related to [Reservoir]'s financial condition, business, properties, or prospects to TGS–NOPEC. Further, Sigmar represented that he would not use the proceeds of the Loan for any other purpose than securing and servicing the Pemex contract (as referenced in the Loan Agreement). Upon information and belief, [neither] Sigmar nor [Reservoir] used the full proceeds of the Loan to secure and service the Pemex contract.

First, Sigmar contends the representation that the loan was to be used solely for securing and servicing the Pemex contract was not a misrepresentation and was not material to TGS. Sigmar points to his testimony that, after receiving the $5 million loan, Reservoir conveyed $2 million of it to RSM to pay outstanding debt to several entities, including Reservoir. Reservoir was then able to begin paying its vendors (including some that were owned in part by Sigmar), Sigmar's salary, and a loan from Sigmar. Sigmar testified that the $735,000 was used to repay him for loans he had made to Sigma Research and Reservoir and for salary that Sigma Research owed him. Sigmar also points to his testimony that he had taken out loans against his 401(k) and his house to pay expenses he incurred in securing and servicing the Pemex contracts. Sigmar argues that his testimony that all of the outstanding debt was incurred for the purpose of securing and servicing the Pemex contract is uncontradicted.

Sigmar also points to TGS's admission that it knew its $5–million loan was for "working capital in the start-up phase" and argues that there is nothing in the record to indicate that the representation that the loan proceeds were to be used solely to secure and service the Pemex contract was material to TGS. Sigmar argues the lack of materiality is demonstrated in Abdallah's admission that TGS decided to loan money to Reservoir because TGS did not care about Reservoir's work and "[i]t was really about buying into the relationships."

---

5. In announcing the judgment, the trial court stated: "I find that Mr. Sigmar's use of the money to pay back himself was fraudulent and that judgment should be rendered against him for $735,000. He has testified that he told them that he had invested in this himself or paid money himself or something like that. To me, that is evidence that he was giving to TGS to show his commitment to the project and how much he had into it, not to persuade TGS to pay him back for it all."

▮ In connection with his argument, Sigmar asserts that to the extent TGS is complaining that he committed fraud by nondisclosure, the record is devoid of any evidence that he had any duty to disclose information to TGS or that the other elements of fraud by nondisclosure exist.[6] Fraud by omission or non-disclosure is simply a subcategory of fraud because the omission or non-disclosure may be as misleading as a positive misrepresentation of fact when a party has a duty to disclose. *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners,* 237 S.W.3d 379, 385 (Tex.App.-Houston [14th Dist.] 2007, no pet.). But TGS did not allege a fraud-by-nondisclosure claim, the case was not tried on this theory, and the appellants did not argue below that TGS could not prevail on its fraud claim because Sigmar owed no duty to disclose information to TGS. Further, the trial court's judgment awarded recovery to TGS based on TGS's "claim of common[-]law fraud." We conclude, therefore, that the legal and factual sufficiency of the evidence is properly reviewed against the elements of a common-law fraud claim.

▮ Sigmar relies heavily on his own testimony that he had incurred past debt in connection with the project and was entitled to be paid back, that all of the loan proceeds were used to secure and service the Pemex contract, and that in any event using the money to pay back debts was not material to TGS. But the fact finder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Barrientos v. Nava,* 94 S.W.3d 270, 288 (Tex.App.-Houston [14th Dist.] 2002, no pet). The trial court could have determined that Sigmar's conduct in transferring some of the loan proceeds from Reservoir to Tao Technologies, to RSM, back to Reservoir, and then to Sigma Research, which in turn sent it to Maribel Properties and to Sigmar himself evinced Sigmar's intent to carry out a covert scheme to funnel TGS's loan money through his companies to himself rather than the innocent repayment of debt legitimately incurred in connection with the Pemex project. *See Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434–35 (Tex. 1986) (stating that intent is a fact question uniquely within the realm of the trier of fact).

Sigmar contends it was clear that "everyone at TGS knew of [ Reservoir's] desperate need of money" and therefore TGS knew the loan proceeds would be used to pay previously incurred debts. Sigmar and Reservoir point to Sigmar's testimony that he informed TGS that Reservoir had no capital and "a lot of debts" that needed to be paid in order to proceed. Sigmar and Reservoir also point to two spreadsheets Sigmar contends were given to TGS before TGS made the $5–million loan to Reservoir,[7] which contained information on

---

6. The elements of fraud by nondisclosure are (1) the defendant failed to disclose facts to the plaintiff; (2) the defendant had a duty to disclose those facts; (3) the facts were material; (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts; (5) the defendant was deliberately silent when it had a duty to speak; (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting; (7) the plaintiff relied on the defendant's nondisclosure; and (8) the plaintiff was injured as a result of acting without that knowledge. *See 7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.,* 245 S.W.3d 488, 507 n. 27 (Tex.App.-Houston [14th Dist.] 2007, no pet.).

7. The reproductions of the spreadsheets in Defendant's Exhibit 48 are poor quality and difficult to read. Defendant's exhibit 49 is entitled "Reservoir Systems Inc. Business Plan Based on Pemex Contract—Maximum Case–2005–2007." This spreadsheet is dated August 23, 2005.

the past-due debt. But Sigmar does not point us to, and we cannot discern from the exhibits, evidence that TGS was informed of Sigmar's convoluted movement of money resulting in his personal payment to himself of at least $735,000.

· Further, Abdallah testified that the loan was to be used for the Pemex project "going forward" and TGS would not have loaned the money had it known its loan would be used to pay back debts or for Sigmar to pay himself. Also, Sigmar did not tell Abdallah that he was going to use the loan proceeds to pay off back debts. Abdallah also testified that "[w]e, of course, cared about the work. We helped with the operations." Additionally, in the months after the loan was made, TGS personnel repeatedly sought updates from Sigmar on the status of the $30 million Reservoir sought from Alliance Capital and whether the contract with Pemex had been executed.[8] The parties disputed whether Sigmar adequately responded to these requests, but the record reflects at least some evidence that TGS was quite concerned about the status of the project and their $5–million investment in it, and the trial court was entitled to determine the weight and credibility of this evidence.

■ TGS also alleged that Sigmar misrepresented that he had disclosed all material facts related to Reservoir's financial condition, business, properties, or prospects to TGS. The element of materiality is determined by examining whether a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question. *Am. Med. Int'l v. Giurintano*, 821 S.W.2d 331, 338 (Tex.App.-Houston [14th Dist.] 1991, no writ). In the context of fraudu-

lent inducement, it is well established that a "representation is material if it induces a party to enter a contract." *Brush v. Reata Oil & Gas Corp.*, 984 S.W.2d 720, 727. (Tex.App.-Waco 1998, pet. denied). Even if a misrepresentation is not a party's sole inducement for entering into the contract, it may still be material so long as the party relied on it. *Id.* at 727–28; *Marburger v. Seminole Pipeline Co.*, 957 S.W.2d 82, 86 n. 4 (Tex.App.-Houston [14th Dist.] 1997, pet. denied), *disapproved on other grounds*, *Hubenak v. San Jacinto Gas Transmission Co.*, 141 S.W.3d 172, 181–83 (Tex.2004).

■ As discussed above, there was evidence Sigmar made several material representations on which TGS relied. Abdallah testified that the strong relationships Sigmar claimed to have with the "alliance partners," with Pemex, and with the Mexican government were important to TGS's decision to participate in the Pemex project. But, there was evidence that Sigmar misrepresented the strength of his relationships with these entities and individuals. The trial court could have found that TGS would not have participated in the Pemex project but for Sigmar's purportedly strong contacts in Mexico and with Pemex. The appellants do not dispute that the purported relationships Sigmar claimed to have were critical to TGS's investment in the Pemex project; indeed, they contend access to Sigmar's contacts was TGS's main objective.

There was also evidence that Sigmar's representation regarding Reservoir's right to use Paulsson's Massive 3D VSP technology was another factor that induced TGS to invest in the Pemex project. TGS was impressed that Sigmar had managed to

---

8. The loan agreement also required Reservoir to "[p]romptly provide [TGS] with such other information respecting condition or opera-

tions, financial or otherwise, of [Reservoir] as [TGS] may from time to time reasonably request."

secure a contract with Pemex through his purported right to use this technology. Sigmar admitted at trial, however, that he and Reservoir had no such rights. Sigmar contends the evidence shows that Paulsson's participation in the project was not important to TGS because it did not care who was doing the work and later had no objection when another company, Radil, was substituted for Paulsson. But Abdallah testified that "it would have mattered" to TGS in making the loan if it had known that Sigmar's relationships with Paulsson was not good, and "we would have definitely questioned it." And TGS's later acceptance of Radil as a provider is not evidence that TGS did not rely on Sigmar's representation concerning his relationship with Paulsson at the time it was made; Radil's substitution was required when Paulsson refused to provide its technology to Sigmar.

The trial court also could have concluded that Sigmar's representation that he was on the verge of securing a $30–million investment from Alliance Capital was another material representation on which TGS relied. In addition to the testimony and documentary evidence, the materiality of Sigmar's representation that he was close to obtaining the $30–million loan is reflected in the loan agreement, which gives TGS the right to call the Loan "due immediately if [Reservoir] or RSM does not receive the required USD $30 million financing within sixty (60) days" of the loan agreement's effective date. Therefore, the evidence was legally and factually sufficient to support the trial court's finding that Sigmar made one or more material misrepresentations on which TGS relied when it agreed to participate and invest $5 million in the Pemex project.

There was also evidence supporting the trial court's findings that Sigmar knew his representations were false when he made them and that he made the representations with the intention that TGS act on them. A false representation may consist of a deceptive answer or any other indirect but misleading language. *State Nat'l Bank v. Farah Mfg. Co.*, 678 S.W.2d 661, 681 (Tex.App.-El Paso 1984, writ dism'd). False promises of future performance also qualify as false representations which will support fraud. *Spoljaric*, 708 S.W.2d at 434. Further, a defendant who acts with knowledge that a result will follow is considered to intend the result. *See Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 579 (Tex.2001).

As previously discussed, Sigmar's purported right to use Paulsson's Massive 3D VSP technology was premised on a representation which Sigmar admitted was false when he made it. Having made at least one such false representation, the trial court could have concluded that the evidence outlined above supports findings that Sigmar's other representations were false when made and that Sigmar intended for TGS to make the $5–million loan to Reservoir based on these representations. Further, the trial court could have found that Sigmar failed to adequately provide accurate updates and financial information regarding how the loan proceeds were being used, and that this failure was some evidence that Sigmar intended to secretly divert money from the Pemex project for his own use at the time he made the representations. *See Spoljaric*, 708 S.W.2d at 435.[9]

Finally, Sigmar contends TGS suffered no injury by relying on his representations. He argues that there was no evi-

---

9. Thus, at the very least, the evidence is legally and factually sufficient to support the theory that Sigmar fraudulently paid himself a portion of the loan proceeds.

dence Reservoir did not pay TGS back because it used the loan proceeds on past-due debt; rather, the evidence showed that Reservoir could not pay TGS back because Reservoir was not allowed to complete the Pemex contract. On these facts, however, we conclude the trial court correctly awarded TGS damages based on Sigmar's fraud. The trial court could have concluded that TGS was not merely loaning money to be repaid, but was relying on Sigmar's representations that TGS would be an alliance partner in the direct-award contract with Pemex worth $30 million.[10] There was also some evidence that Sigmar represented that the potential existed for a lucrative relationship with Pemex in the future, which would have been of significant value to TGS. Sigmar testified that "Pemex had hundreds of wells that needed these services and we shared our financial models and proforma projections with TGS."[11] Additional evidence of the potential value to TGS of a relationship with Pemex is found in the loan agreement, in which TGS retained a right to convert the loan into a ten-percent-net-profits interest in the Pemex contract. The trial court could have found that TGS would not have included this provision in the loan agreement if it did not believe, based on Sigmar's representations, that that it could potentially profit from the relationship by more than the amount of the loan.

The trial court also could have inferred from the evidence that Sigmar's conduct in diverting the loan proceeds to his companies and to himself personally, of which the $735,000 was a part, instead of paying the debts owed to participating vendors contributed to the project's eventual failure and ultimately the loss of a promising business association for TGS. Thus, the amount awarded—$735,000—represents some portion of TGS's losses resulting from Sigmar's fraud.[12] That TGS's damages have not been calculated with mathematical precision is not a bar to recovery. *See O & B Farms, Inc. v. Black*, 300 S.W.3d 418, 422 (Tex.App.-Houston [14th Dist.] 2009, pet. denied); *see also State v. Buckner Constr. Co.*, 704 S.W.2d 837, 843–44 (Tex.App.-Houston [14th Dist.] 1985, writ ref'd n.r.e.) ("The amount of damages should be fixed by the factfinder in the exercise of sound discretion when the damages cannot be calculated with mathematical certainty.").

Accordingly, we conclude the evidence is legally and factually sufficient to support the trial court's judgment that Sigmar committed fraud. We overrule Sigmar's and Reservoir's first issue.

### III

In his second issue, Sigmar contends that this case is about a suit on a note—not fraud. Specifically, he contends that both of the proposed theories of fraud relate to obligations found within the terms of the contracts and the only economic loss to TGS was the loss of payment of the note. He also contends that *Formosa Plastics's* exception to the economic-loss rule does not apply because there is insuf-

---

10. Abdallah admitted that one of TGS's main goals was to conduct activities in Mexico, and that he had characterized Mexico as "the Jewel of the Nile." He also testified that Mexico was the largest potential project left in the world for anyone in the oil and gas industry.

11. Although the trial court sustained TGS's objections to much of Sigmar's testimony concerning the value of future contracts with Pemex on hearsay grounds, the trial court permitted this testimony for the limited purpose of demonstrating that TGS had notice that additional contracts were expected.

12. The $735,000 award is for damages arising from fraud, but neither party contends that it represents a lost-profits award.

ficient evidence in the record that TGS actually entered into these contracts based on the alleged representations or that any of the representations are false. *See Formosa Plastics Corp.*, 960 S.W.2d at 47–48. Further, Sigmar and Reservoir contend that by recovering both tort and contract damages for the same injury, TGS has received an improper double recovery in violation of the one-satisfaction rule and should have elected its remedy. *See Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998) (per curiam).

▮ Initially, TGS responds that Sigmar did not object below on one satisfaction or election of remedies and therefore may not raise these grounds for the first time on appeal. We agree. *See* Tex. R.App. P. 33.1(a); *Lake v. Premier Transp.*, 246 S.W.3d 167, 174 (Tex.App.-Tyler 2007, no pet.); *A.M. Barbar Corp. v. Hellriegel*, No. 09–05–077–CV, 2006 WL 2506417, at *2 (Tex.App.-Beaumont Aug. 31, 2006, no pet.); *Andrews v. Sullivan*, 76 S.W.3d 702, 708 (Tex.App.-Corpus Christi 2002, no pet.); *Johns v. Ram–Forwarding, Inc.*, 29 S.W.3d 635, 638 (Tex.App.-Houston [1st Dist.] 2000, no pet.), *disapproved on other grounds, Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620 (Tex. App.-Houston [1st Dist.] 2010, no pet. h.). Because the issue has not been preserved, we do not reach the question of whether the two awards—$5 million for breach of contract and $735,000—comprise an impermissible double recovery by TGS.

▮ Turning to Sigmar's argument that this case involves only a suit on a note and not a tort claim, we begin with the *Formosa Plastic* court's recognition that Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations. *See Formosa Plastics Corp.*, 960 S.W.2d at 46. It is also well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself. *Id.* Tort damages are recoverable for a fraudulent-inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract. *Id.* at 47. Further, Texas law recognizes out-of-pocket and benefit-of-the-bargain measures of direct damages for common-law fraud. *Id.* at 49. The out-of-pocket measure computes the difference between the value paid and the value received, while the benefit-of-the-bargain measure computes the difference between the value as represented and the value received. *Id.*

As discussed above, the evidence is legally and factually sufficient to support the fraud finding against Sigmar. Further, the trial court made separate findings that Sigmar committed fraud and Reservoir breached the loan agreement. The trial court also awarded TGS different amounts of damages on each cause of action. Reservoir does not dispute that TGS loaned it $5 million and Reservoir failed to repay the loan. But the evidence also showed that TGS is not a bank and was not merely lending money to Reservoir. TGS's fraud claim was based on Sigmar's additional promises of benefits that were collateral to the repayment of the loan; namely, that TGS would become an alliance partner in the Pemex project and reap the benefits of that association. Sigmar's fraud deprived TGS of those benefits.

Texas courts, including this one, have permitted a recovery of both breach-of-contract and fraud damages on similar facts. In *LJ Charter, L.L.C. v. Air America Jet Charter, Inc.*, No. 14–08–00534–CV, 2009 WL 4794242, at *7–8 (Tex.App.-Houston [14th Dist.] Dec. 15, 2009, pet. filed),

this court held that Air America did not receive a double recovery for a single injury when it was awarded $25,000 for breach of contract and separate damages for LJ Charter's fraudulent conduct. In *Tristan v. C.A. Walker, Inc.*, No. 13–01–410–CV, 2003 WL 21212342, at *2 (Tex.App.-Corpus Christi May 27, 2003, pet. denied), the court of appeals affirmed a judgment awarding Tristan damages on both a breach-of-contract claim and a fraud claim when Tristan pleaded separate theories of liability, the two theories of liability arose from separate injuries, and each theory of liability resulted in a separate finding of damages.

Perhaps most analogous is *Medical Air Services Ass'n v. Kebert*, 26 S.W.3d 663 (Tex.App.-Corpus Christi 2000, pet. denied). In that case, Kebert, a sales representative, was permitted to recover past commissions against Medical Air Services based on breach of contract and additional commissions against Halley, the owner of the company, based on fraud. *Id.* at 668. The court stated that "[a]lthough the damages awarded to Kebert were for renewal commissions lost as a result of the breach of contract, there was evidence of additional commissions the jury could have believed were lost to Kebert because of Halley's fraudulent acts." *Id.*

■ Here, TGS's remedy for Reservoir's failure to repay the loan compensates TGS for its out-of-pocket loss for the loan. TGS's remedy for Sigmar's fraud compensates TGS for a portion of what it expected to receive based on Sigmar's representations regarding the Pemex project. Because TGS suffered separate and distinct injuries and damages from Sigmar's fraud and Reservoir's breach of contract, the trial court did not err in awarding judgment on both causes of action. *See LJ Charter, L.L.C.*, 2009 WL 4794242, at *7–8; *Tristan*, 2003 WL 21212342, at *2;

*Medical Air Services Ass'n*, 26 S.W.3d at 668.

Therefore, we conclude that the trial court did not err in awarding fraud damages against Sigmar and we overrule Sigmar's second issue.

## IV

■ In the appellants' third issue, Reservoir contends that the trial court erred in excluding all evidence of damages on Reservoir's counterclaims. We review a trial court's evidentiary rulings for abuse of discretion. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000).

In an amended answer, Reservoir alleged counterclaims against TGS for tortious interference with existing contract, conspiracy, and breach of contract. TGS served Reservoir with a request for disclosures and interrogatories seeking, among other things, discovery of the damages Reservoir sought for each of its claims. In response to the disclosure request, which was sought before Reservoir asserted counterclaims, Reservoir represented only that it "has not asserted a claim for damages." In response to TGS's interrogatories concerning damages, Reservoir stated, "[Reservoir] has yet to fully quantify its damages and will amend its response as and when appropriate." Reservoir never supplemented these responses.

On the first day of trial, TGS filed a motion to exclude Reservoir's evidence of its counterclaims, including any evidence of damages. TGS pointed out that, after filing its counterclaims, Reservoir did not supplement or amend its discovery or produce any calculations or expert reports on its alleged damages, and the deadline for discovery provided in the court's docket control order had passed. TGS moved to exclude any evidence based on Rule

193.6(a) of the Texas Rules of Civil Procedure, which provides that "[a] party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed," unless it finds that (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties. *See* Tex.R. Civ. P. 193.6(a).

 The trial court conducted a lengthy and detailed hearing in which it repeatedly questioned Reservoir's counsel about how Reservoir intended to calculate its damages. Reservoir was unable to articulate a coherent damage model beyond asserting that if given the opportunity at trial, Reservoir would prove up the value of the contracts it lost through TGS's alleged wrongdoing, including an amount for future contracts worth $193 million.[13] Reservoir also asserted that it had produced evidence of damages in the form of invoices for approximately $9 million for expenses incurred in servicing the Pemex contract, which it belatedly discovered and sent to TGS shortly before trial.[14] The trial court found that there was "definitely" no good cause for Reservoir's failure to timely make, amend, or supplement its discovery responses, and that Reservoir's failure would cause TGS unfair surprise or unfair prejudice. She further stated on the record:

I find that the defendants even now cannot really tell me exactly what you think your damages are. You've got a general idea but you cannot tell me the amount and method of calculating the damages that you're going to argue for at the end of this trial and I find that it's a definite prejudice to the plaintiffs for you not to have told them sometime before today how you were going to figure that and the figures that you were going to use to figure that. So I am excluding evidence of damages for [Reservoir].

On appeal, Reservoir points out that its trial counsel represented below that it had timely supplied the information through document production and through deposition, but concedes there is nothing in the record to support this assertion. Reservoir also contends it made the information available in responses to TGS's motion for partial summary judgment. Attached as evidence to the responses was Sigmar's affidavit, in which he averred that RSM had received the first phase contract with Pemex, the total value of the contract was going to be $193 million, and as a result of TGS's actions, Pemex suspended performance under the contract. Reservoir argues that it therefore timely made the information known to TGS, citing Rule 193.5, which provides that a party is required to amend or supplement its discovery responses that are no longer complete or correct "unless the additional or corrective information has been made known to the other parties in writing, on the record

13. At one point, Reservoir's counsel argued that there would be evidence that follow-up contracts could have been worth up to $300 million. The trial court asked counsel what Reservoir was asking for, and he stated, "we're developing our model now but certainly at least what we weren't paid by RSM ...."

14. The invoices presented were apparently mostly illegible. Reservoir's counsel stated that they were working to enhance the copies, and the trial court stated, "In looking at them through a magnifying glass, even with a magnifying glass I find that [the invoices] are only partially legible. You can kind of guess what it says in spots."

at a deposition, or through other discovery responses." See Tex.R. Civ. P. 193.5(a)(2).

The party offering the undisclosed evidence has the burden to establish good cause or lack of unfair surprise or unfair prejudice. *See* Tex.R. Civ. P. 193.6(b); *Harris County v. Inter Nos. Ltd.,* 199 S.W.3d 363, 367 (Tex.App.-Houston [1st Dist.] 2006, no pet.). Rule 193.6(a) is mandatory, and the penalty—exclusion of evidence—is automatic, absent a showing of good cause, lack of unfair surprise, or lack of unfair prejudice. *Lopez. v. La Madeleine of Tex., Inc.,* 200 S.W.3d 854, 860 (Tex.App.-Dallas 2006, no pet.); *see also Alvarado v. Farah Mfg. Co.,* 830 S.W.2d 911, 914 (Tex.1992). The purpose of this rule and its accompanying sanction is to prevent trial by ambush. *See Aetna Cas. & Sur. Co. v. Specia,* 849 S.W.2d 805, 807 (Tex.1993).

On this record, we cannot say that Reservoir's opinion of the gross value of their contracts and some invoices equate to a damages model. Further, Reservoir does not explain how the gross value of anticipated contracts between RSM and Pemex relate to Reservoir's alleged damages. We conclude that the trial court did not abuse its discretion in granting TGS's motion to exclude evidence of Reservoir's alleged damages on its counterclaims. *See Harris County,* 199 S.W.3d at 367–69. Further, because we have concluded that Reservoir failed to timely provide evidence of its damages, Reservoir cannot establish any of its causes of action.

We therefore overrule the appellants' third issue.

\* \* \*

We overrule Sigmar's and Reservoir's issues and affirm the trial court's judgment.