**GB TUBULARS, INC., Appellant**

v.

**UNION GAS OPERATING COMPANY, Appellee**

**NO. 14-15-00671-CV**

Court of Appeals of Texas, Houston (14th Dist.).

Opinion filed June 29, 2017

Brian Charles Poldrack, Houston, TX, for appellant.

James Nye, Paul S. Francis, Cody Vasut, Houston, TX, for appellee.

Panel consists of Justices Boyce, Christopher, and Jamison.

## OPINION

Martha Hill Jamison, Justice

Union Gas Operating Company sued GB Tubulars, Inc. after the failure of an oil and gas well in which Union Gas used equipment purchased from GB Tubulars. Union Gas asserted numerous causes of action premised on the incident, including several theories of products liability, negligence, and breach of express and implied warranties. The jury found among other things that GB Tubulars breached an express warranty causing Union Gas to incur $3 million in damages. The jury additionally found that Union Gas was negligent and therefore responsible for 45 percent of its own damages and that a reasonable and necessary fee for Union Gas's attorneys in this case was zero. The trial court granted Union Gas a new trial on the attorney's fees issue, which was then retried to the bench. In its final judgment, the trial court awarded Union Gas damages for breach of an express warranty and attorney's fees but did not reduce the damages award based on Union Gas's own negligence.

In five issues on appeal, GB Tubulars contends that (1) the trial court erred in admitting evidence of other well failures; (2) the evidence was legally and factually insufficient to support the jury's findings on breach of an express warranty; (3) the trial court erred in submitting multiple jury questions premised on the same facts; (4) the trial court erred in refusing to take into account Union Gas's negligence in determining the amount of damages to award; and (5) the trial court erred in granting Union Gas a new trial on attorney's fees. We affirm.

## I. Overview

In 2010, Union Gas drilled the Dubose #2H well in the Eagle Ford Shale formation in Gonzales County, Texas. Union Gas engineering consultant Russell Chabaud testified that he consulted GB Tubulars' website, viewed its products specifications on a datasheet published there, and decided to select certain GB Tubulars' couplings for use in the well.[1] In September 2010, Union Gas purchased couplings from GB Tubulars and began installing casing strings (joints joined together by the couplings) in the well. After installation and during hydraulic fracking operations in the well, the well failed on September 21, 2010 when casing joints and couplings separated. Union Gas ultimately had to plug and abandon the well.

After an investigation by consultant Viking Engineering into the causes of the failure, Union Gas sued GB Tubulars, raising the following theories of recovery: strict products liability based on a design defect, a manufacturing defect, and a marketing defect; breach of an express warranty; breach of the implied warranties of merchantability and fitness for a particular purpose; negligence; negligent misrepresentation; and several varieties of

---

1. Well casing is fabricated in sections, called "joints," that are connected end-to-end by short, cylindrical connections called "couplings."

violations of the Texas Deceptive Trade Practices Act, including false, misleading, or deceptive acts or practices, breach of express warranties, breach of implied warranties, and unconscionable conduct. During trial, both sides presented expert witnesses who testified regarding causation of the well failure. Union Gas also presented evidence regarding failures in other wells where GB Tubulars couplings were installed. GB Tubulars objected to this evidence on the ground that the other incidents were not sufficiently similar to the subject occurrence.

The trial court submitted to the jury all twelve theories of recovery noted above. The jury found no design or manufacturing defect existed and no breach of an implied warranty of merchantability, negligent misrepresentation, or unconscionable conduct occurred. However, the jury found that there was a marketing defect, that GB Tubulars breached five express warranties as well as the implied warranty of fitness for a particular purpose and express and implied warranties under the DTPA, and that GB Tubulars committed negligence, which was defined to include negligent marketing. For each tort that the jury found GB Tubulars committed, it found damages in the amount of $3 million. The jury also found that 45 percent of Union Gas's damages were caused by its own negligence. Although the jury affirmatively answered several predicate questions, it found the amount of Union Gas's reasonable and necessary attorney's fees to be zero.

After the jury returned its verdict, Union Gas moved to accept the verdict into the record. Union Gas subsequently filed a motion for new trial arguing that "zero" was an inappropriate response to the jury question on attorney's fees. The trial court granted the motion, and the parties agreed to retry the attorney's fees issue to the bench. Union Gas also elected to recover damages under its breach of express warranties cause of action. In its final judgment, the trial court awarded Union Gas $3 million for breach of express warranties and $950,000 in attorney's fees. The court further awarded prospective attorney's fees should GB Tubulars appeal the judgment.

## II. Sufficiency of the Evidence

■ We begin with GB Tubulars' second issue—asserting the evidence is legally and factually insufficient to support the jury's finding on breach of express warranties—because legal sufficiency is a potential reverse and render point. See Horrocks v. Tex. Dep't of Transp., 852 S.W.2d 498, 499 (Tex. 1993); see also In re Estate of Parrimore, No. 14-14-00820-CV, 2016 WL 750293, at *4 (Tex. App.—Houston [14th Dist.] Feb. 25, 2016, no pet.) (mem. op.) ("We address these issues first because, if successful, they would provide appellants with the greatest relief.").[2]

■ When reviewing for legal sufficiency, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports the challenged finding. City of Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. Id. at 827. If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails. BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 795 (Tex. 2002).

**2.** Because GB Tubulars does not differentiate in its argument between its legal sufficiency and factual sufficiency challenges, we will address the arguments just once while applying the differing standards.

In reviewing the factual sufficiency of the evidence, we consider all of the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). The factfinder is the sole judge of witness credibility and the weight to be given testimony. *Keller*, 168 S.W.3d at 819. Where, as here, the parties have not objected at trial to the substance of the law set forth in the jury charge, we review sufficiency of the evidence in light of legal standards contained in the unobjected-to charge. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge.").[3]

The jury charge contained a series of questions relating to alleged express warranties. The charge defined "express warranty" as "an affirmation of fact or promise made by GB Tubulars [which became] a basis of the bargain. It is not necessary that GB Tubulars used formal words such as 'warrant' or 'guarantee' or that it had a specific intention to make a warranty." The charge further defined "producing cause" in this context as "a cause that was a substantial factor in [the] bringing about of an occurrence, and without which the occurrence would not have occurred. There

may be more than one producing cause." The jury found that the Connections failed to meet the following representations made by GB Tubulars that became "part of the basis of the bargain" and that the failures were a producing cause of the well failure:[4]

(1) the Connections exceeded casing pipe performance properties under all load combinations,

(2) the Connections were rated for a Minimum Internal Yield Pressure of 12,-640 pounds per square inch (psi),

(3) the Connections were rated for a Minimum Connection Tension of 685 kips (685,000 pounds-force),

(4) the Connections were rated for a Minimum Joint Strength of 667 kips (677,000 pounds-force), and

(5) the Connections had enhanced fatigue life.[5]

In its appellate briefing, GB Tubulars does not deny that these statements constituted express warranties or that Union Gas relied on the statements in deciding to purchase the couplings. Instead, GB Tubulars asserts that Union Gas failed to present evidence of breach of any of these warranties or resulting causation of injuries.

Union Gas argues that the jury's findings on breach and causation are supported by several pieces of evidence, in-

---

**3.** At trial, GB Tubulars objected that the questions regarding express warranties should have been submitted in broad form and predicated on a question regarding whether Union Gas actually purchased the connections from GB Tubulars. On appeal, GB Tubulars neither contends that the trial court erred in overruling these objections nor contends that our analysis of the sufficiency of the evidence should be changed in any way in light of these objections.

**4.** The jury charge used the terms "Connection" and "Connections" to reference the GB

Tubulars couplings sold to Union Gas. We will use the terms interchangeably.

**5.** The jury rejected three other submitted express warranty claims, which were based on representations that (1) "[t]he Connections were gas tight," (2) "[t]he Connections had high-torque resistance," and (3) "[t]he Connections would meet the standards of API Grade P-110." In each case, the jury found that the representation was made and was a basis of the bargain but declined to find that the specific warranty was breached and was a producing cause of the well failure.

cluding investigative reports prepared by Viking Engineering and MTL Engineering, pressure charts from the well at the time of failure, and testimony from Viking Engineer John Greenip and expert witnesses Brian Schwind and William Coleman. The Viking and MTL reports conclude the well failure was caused by a crack that formed in one of the couplings and "[t]he loads on the string did not exceed the published performances of the pipe body or the CDE connection [i.e., the GB Tubulars coupling]." In other words, the coupling failed though under stress within the advertised parameters for the product. This conclusion is supported by the charts showing well pressure at the time of failure. Greenip, who authored the Viking reports, also testified that two representations were inaccurate: (1) that the couplings exceeded the casing pipe's performance properties under all load combinations, and (2) that the couplings could withstand a minimum connection tension of 685,000 pounds-force.

Coleman, a metallurgical engineer, testified that GB Tubulars did not use "reasonable care" in representing the couplings' performance characteristics on the website's data sheet. He stated that the claim that the couplings possessed enhanced fatigue resistance was inaccurate. He further opined that the claim the couplings were at least as strong as the pipe body was inaccurate and specifically noted that the wall thickness of the coupling where the crack occurred was thinner than the pipe body.[6] He explained that a thinner cross-section meant that the coupling could not withstand the same loads as the pipe body. Lastly, Coleman testified that the advertised capacity of the coupling, i.e., "how

much this thing can handle before it breaks," was inaccurate.

Schwind, a consulting engineer, testified that the GB Tubulars coupling was similar to another product that had had to be "redefined" to be considered reliable. He explained that pressure vessels, such as casing pipe and couplings, are normally not "plastically deformed," i.e., stressed beyond the point where they can return to their original shape. He then opined that the coupling that cracked had been stressed to a level that it was plastically deformed. He said the data sheet did not provide stress limits and "the specifications that are there"—clearly referencing the actual properties of the coupling and not the parameters in the data sheet—did "not permit it to perform in a reliable manner." Schwind additionally asserted that the GB Tubulars promotional materials were inaccurate regarding the couplings' physical properties. He explained that the couplings actually had a smaller "section area" than the pipe and indicated that this resulted in a lower joint strength than indicated in the materials. He continued that the minimum joint strength listed in the materials appeared to be taken from a different product. Additionally, Schwind said that the listed internal yield pressure was inaccurate. He explained that this would affect whether the coupling could return to its original shape when pressure was released. Also, Schwind averred that because the couplings did not possess 100% of the minimum internal yield pressure of the pipe, it would not have been reliably leak resistant. He said that it was inaccurate to say the connection was "as strong as the pipe body when, in fact, it's

6. The GB Tubulars data sheet for the couplings showed performance characteristics for both the couplings and associated casing. The minimum internal yield pressure for the

couplings was stated as a percentage (100%) of the minimum internal yield pressure for the casing.

significantly higher stressed and significantly weaker than the pipe body."

Schwind further asserted that these errors in the promotional materials caused an operator or drilling engineer to be misled into using this product. Although Schwind's statement was generic, it supports Chabaud's testimony that he chose the GB Tubulars couplings for application on the Dubose #2H well after viewing the specifications on the website. Schwind concluded that the couplings were not fit for use in a horizontally drilled well that was going to be fracture stimulated.

■ GB Tubulars nevertheless argues this evidence establishes no causal connection between inaccurate representations and the well failure. As GB Tubulars correctly points out, expert testimony related to causation is required when an issue involves matters beyond jurors' common understanding. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006).

We conclude that, considering the evidence in the light most favorable to the finding, legally sufficient evidence supports the jury's finding as to causation. As described, Union Gas presented evidence—including expert testimony—of misrepresentations regarding the couplings' physical properties and ability to withstand certain levels of pressure and stress; Union Gas presented expert testimony regarding the problems that such misrepresentations could cause; and Union Gas presented evidence—including expert testimony—that at least one of the couplings failed at pressure levels within those representations. Union Gas also presented expert testimony that the alleged misrepresentations could have misled a drilling engineer into using the product and evidence that Union Gas

purchased the couplings relying on the misrepresentations. The jury is authorized to make reasonable inferences from the evidence. *See, e.g., Sw. Key Program, Inc. v. Gil-Perez*, 81 S.W.3d 269, 274 (Tex. 2002) ("While examining the record to determine if there is sufficient evidence of causation, we must view the evidence in a light that tends to support the finding of causation and disregard all evidence and inferences to the contrary."); *Gunn v. McCoy*, 489 S.W.3d 75, 93 (Tex. App.—Houston [14th Dist.] 2016, pet. filed) (upholding jury verdict on causation in medical malpractice case after considering all evidence, including expert testimony, and reasonable inferences therefrom in the light most favorable to the jury's findings). The evidence therefore supported the jury's apparent conclusion that misrepresentations regarding the couplings' properties led Union Gas to purchase and use the couplings for a purpose that they were not capable of performing, thus proximately causing damages.

■ GB Tubulars additionally asserts that, as Union Gas's experts testified, the couplings corroded after installation in the well, which could have caused the failure. In support, GB Tubulars cites *Safeway Stores, Inc. v. Certainteed Corp.*, 710 S.W.2d 544, 548 (Tex. 1986) (discussing under what circumstances an express warranty under the Uniform Commercial Code may extend to future performance), and *American Alloy Steel, Inc. v. Armco, Inc.*, 777 S.W.2d 173, 176 (Tex. App.— Houston [14th Dist.] 1989, no pet.) (same).[7] We note that the coupling in question failed after being in the well for less than two weeks. However, even if corrosion was present, that does not require the conclusion that one or more of the warranty

---

7. *Safeway* and *American Alloy* are statute of limitations cases that do not directly support GB Tubulars' argument. GB Tubulars does not cite any other authority in support of its argument.

breaches found by the jury could not have been a producing cause of the well failure. As defined by the charge, "producing cause" means "a cause that was a substantial factor in [the] bringing about of an occurrence, and without which the occurrence would not have occurred. There may be more than one producing cause." *See Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007). Moreover, Union Gas argued at trial that the couplings should have been able to withstand expected corrosive effects of being used in-ground. Although GB Tubulars disagrees, arguing the warranties did not apply in a corrosive environment, it does not cite conclusive evidence or helpful authority in support of its position.

As described, the evidence was legally and factually sufficient to support the jury's conclusion that GB Tubulars' breach of one or more express warranties was a producing cause of Union Gas's damages. Accordingly, we overrule GB Tubulars' second issue.

### III. Evidence of Other Failures

We next turn to GB Tubulars' first issue, the trial court's alleged error in admitting evidence of other well failures because Union Gas failed to demonstrate that the other failures occurred under sufficiently similar circumstances. The evidence GB Tubulars complains about concerns sixteen other well failures in which the same or similar GB Tubulars' couplings were involved. Union Gas introduced fairly voluminous records and reports regarding these other failures, questioned several witnesses regarding the other failures, and offered the testimony of one witness who worked on one of the failed wells. GB Tubulars contends that Union Gas failed to establish the admissibility of this evidence by demonstrating the other failures occurred under substantially similar circumstances as the failure at issue in this case. GB Tubulars also asserts that this evidence was introduced solely to prejudice, distract, and mislead the jury.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 918 (Tex. 2004). A trial court abuses its discretion when it acts in an unreasonable or arbitrary manner, or without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). An erroneous evidentiary ruling warrants reversal only if the error probably caused the rendition of an improper judgment. *Volkswagen*, 159 S.W.3d at 918. In making this determination, we consider the entire record. *Id.*

### A. *Nissan* and *Kia*

The Texas Supreme Court addressed the admission of evidence concerning other incidents of a product defect in *Nissan Motor Co., Ltd. v. Armstrong*, 145 S.W.3d 131 (Tex. 2004).[8] The court specifically listed three restrictions to the admission of such evidence. First, "the other incidents must have occurred under reasonably similar (though not necessarily identical) conditions." *Id.* at 138; *accord Missouri–K.–T.R. Co. v. May*, 600 S.W.2d 755, 756 (Tex. 1980). To prove the proper predicate in a product defect case, the

---

**8.** We agree with GB Tubulars that its first issue is germane, even though Union Gas elected to recover under its breach of warranty cause of action and the jury did not find a design or manufacturing defect existed. The jury found a marketing defect existed, and the breach of warranty claim was based on the allegation that the GB Tubulars coupling was deficient in that it could not match the represented performance parameters. We find the *Nissan* relevancy analysis applicable to this situation.

proponent of the evidence must offer evidence indicating that the defect that caused the other incidents was similar to the defect alleged in the case at hand. *Nissan*, 145 S.W.3d at 138. "Second, evidence of similar incidents is inadmissible if it creates undue prejudice, confusion or delay." *Id.* "[P]rolonged proof of what happened in other accidents cannot be used to distract a jury's attention from what happened in the case at hand." *Id.* And "[t]hird, the relevance of other accidents depends upon the purpose for offering them." *Id.* For example, other incidents may be relevant to show whether a product was defective or unreasonably dangerous or that a manufacturer was on notice of prior or continuing problems with the product. *See id.* at 138–39. The court cautioned trial judges, in exercising their discretion regarding the admission of evidence, to "carefully consider the bounds of similarity, prejudice, confusion, and sequence before admitting evidence of other accidents involving a product." *Id.* at 139.

In *Nissan*, the supreme court specifically considered evidence that had been admitted at trial concerning accidents caused by unintended acceleration of motor vehicles. The plaintiff alleged that a faulty throttle cable caused her Nissan vehicle to accelerate while she was depressing the brake pedal. *Id.* at 134. In support of her claims, she presented evidence of other incidents of unintended acceleration, including a manufacturer's database of 757 complaints of unintended acceleration.[9] *Id.* at 140. Noting that none of the database complaints identified the throttle cable as the culprit and nothing else in the database suggested the defect, if any, that caused those incidents was similar to the defect alleged by the plaintiff, the supreme

court held that the trial court erred in admitting the database. *Id.* at 141.

The trial court additionally admitted "approximately sixteen" separate narrative reports of unintended acceleration, three from the files of NHTSA and the rest from Nissan itself. *Id.* at 142. The supreme court concluded that the trial court did not err in admitting eight of the reports that concerned allegedly similar defects to the one the plaintiff alleged, as they "point[ed] to a defective throttle cable ... as the cause." *Id.* The supreme court also held that the trial court erred in admitting the testimony of four witnesses because none of them identified a defect similar to the one asserted by the plaintiff and "[o]ther than having accidents they described as unintended acceleration, these owners could show no similarity between their experiences and those involved in [the plaintiff's] suit." *Id.* at 143. The court emphasized throughout that bare evidence of unintended acceleration was no evidence of plaintiff's vehicle defect. *See id.*

The supreme court revisited *Nissan* in *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865 (2014). *Kia* also was a products liability case against a vehicle manufacturer, involving the allegation that a defect caused the failure of an airbag to deploy during a collision. Specifically, the plaintiff alleged that defective wiring connectors for a clock spring and a module created an open circuit that prevented the air bag from deploying. *Id.* at 869. The evidence in question consisted of a spreadsheet summarizing warranty claims involving air bags in similarly designed vehicles from the same manufacturer. *Id.* at 868. The spreadsheet listed 432 air bag warranty claims, but the plaintiff acknowledged that 365 claims that did not involve error code "56," the open

---

**9.** In both *Nissan* and *Kia, infra*, the court considered several issues relevant to objections made to the evidence, including hearsay.

We do not include those considerations in our discussion here.

circuit code that had been triggered in plaintiff's vehicle, were not relevant in the case. *Id.* at 878-79, 881. Regarding the sixty-seven code 56 claims, the supreme court concluded that, because code 56 could relate to a number of different potential problems, there needed also to be some indication that the clock-spring and module connectors contributed to a particular claim. *Id.* at 881-82.[10] On that basis, the supreme court held that some of the code 56 complaints were relevant and some were not. *Id.* at 882-83.

## B. Evidence as to Similar Well Failures

Here, the evidence regarding the sixteen other well failures meets the test articulated in *Nissan* and *Kia*. The evidence came through detailed investigative reports and expert opinions. Of course, simply providing more information about other incidents does not render the evidence admissible if it does not otherwise tie the other incidents to the one alleged here. *See Nissan*, 145 S.W.3d at 138.

Greenip, the engineer who authored the Viking investigative reports, personally participated in the investigation of at least seven of the other well failures and provided a load-strength analysis for another. He stated that none of the well failures he examined involved loads exceeding the published performance guidelines for the couplings. He further noted that all but one of the other failed couplings were 5½ inches in diameter, the same as the failed coupling in Union Gas's well. The other was 5 inches in diameter. All of the failed couplings Greenip analyzed were made of P-110 grade steel, and none showed any signs of having been exposed to hydrogen sulfide. Greenip stated that all of the coupling failures were "circumferential or transverse cracks that initiated on the inside at the intersection of the shoulder and the relief area." He also criticized both the coupling's design, saying it made "the intersection of the torque shoulder and the relief diameter vulnerable to high stress," and the published performance specifications, indicating the couplings were not in fact capable of full pipe body performance as represented.

Coleman, the expert metallurgical engineer, also discussed other well failures. He said that of the failures with which he was familiar, none were caused by operation of the well but all were "related to the coupling, its design and intended use." He said that he saw nothing at the Union Gas well that was environmentally different from other oil and gas wells. He opined that other failures with which he was familiar were caused by the same style of fracture in the same location on the coupling as occurred here.

Randy Holt testified by deposition that he worked for Citrus Energy on a well that failed due to a fractured GB Tubulars' coupling. He discussed the specifics of the well conditions and operations. He provided details regarding the cracked coupling in the Citrus Energy well and its similarity to other fractures occurring in other wells, including the Union Gas well at issue in this case. He concluded that the coupling was not able to handle loads as represented by GB Tubulars. He stated that prior to the Citrus Energy well, he had been involved in the drilling of two to three hundred wells, most of them involving multistage fracking operations and had never previously had such a failure.

The remainder of the evidence concerning other incidents included depositions on written questions from several of the well

---

10. The supreme court held, for example, that code 56 claims that reflected an unknown cause or did not address the cause were not admissible. *Kia*, 432 S.W.3d at 881.

producers, investigative reports by Viking and MTL on the failures, and a number of emails between engineers. The analytical reports in particular contained significant information regarding the conditions at each well, including the components used, the temperatures and loads, the nature of the soil encountered, and the details of each coupling failure.

### C. Analysis

In its appellate briefing, Union Gas provides the following list of similarities, along with citations to the record in support:

- GB Tubulars CDE Connections [the type of coupling at issue here] were used in each of the other sixteen wells that failed;
- The connections were all P-110 grade steel;
- The connections were all between 5 inches and 5 ½ inches in diameter;
- The connections all failed at the base of the internal shoulder;
- The connections all failed circumferentially;
- The connections all failed from the inside out;
- Twelve of the similar failures occurred in the "mill end" connection, that is, the connection that GB Tubulars or its contactors attached to the joint;
- The sixteen other wells were all shale wells;

- The sixteen other wells were all horizontal wells;
- The sixteen other wells were all hydraulically-fractured wells;
- The connections all failed in the vertical section of the casing string rather than the horizontal section;
- The connections all failed at pressures below the pressure rating specifications published by GB Tubulars;
- The connections all failed while the wells were being put into service;
- The connections all failed within a close period of time: between March 2010 and May 2013;
- There was no evidence the connections were exposed to hydrogen sulfide prior to failure; and
- Almost all of the connections were exposed to 15% diluted hydrochloric acid, an industry standard practice, before failure.

GB Tubulars generally does not dispute the accuracy of these representations; instead, GB Tubulars argues that these were merely superficial similarities and that nothing the evidence revealed about the other failures justifies an inference of similar causation. Without citation, GB Tubulars specifically claims that the descriptors "shale," "horizontal," and "hydraulically-fractured" would likely apply to most new wells in Texas and that failures in wells not using GB Tubulars' products probably occurred under similar circumstances.[11]

11. GB Tubulars lists additional factors it claims Union Gas failed to prove were consistent in the different wells, including parts of the well equipment, the stresses experienced in the well, well geometry and design, soil chemistry, and the chemicals used in the drilling and production processes. A cursory examination of the evidence, however, reveals that much of this information was in fact provided. Moreover, GB Tubulars presents no relevant record citations or analysis regarding

how the allegedly missing information would affect the analysis.

GB Tubulars questioned whether the couplings used in the other failed wells were the exact same diameter and weight as the couplings used in the Union Gas well. Although not all of the couplings were of the same diameter and weight, they were all of similar dimensions. Moreover, Greenip testified that the design and warranty problems he identified with the couplings covered a range of

GB Tubulars also suggests that well failures are a common risk in the oil and gas industry and often are caused by "coupling splits," and thus, evidence of other well failures due to coupling splits is not relevant without evidence that links such failures to the same defect as alleged in the case at hand. GB Tubulars is correct that bare evidence of other failures is not evidence of a defect in this case. *See Kia*, 432 S.W.3d at 881-82; *Nissan*, 145 S.W.3d at 143. However, Union Gas presented evidence suggesting that the failures of the other wells were caused by the same properties of the couplings as caused the failure in Union Gas's well. As discussed above, evidence was presented that each well failed due to a GB Tubulars' coupling (of the same type and of the same or similar size) fracturing in the same place in similar fashion at loads below the published parameters of the product. In addition, experts criticized the coupling's design and its published performance parameters, specifically suggesting that the coupling was not capable of handling the listed stresses in the very area where the couplings fractured.

### D. Conclusion as to Evidentiary Ruling

In *Nissan* and *Kia*, the jury was asked, respectively: What caused the car to unintentionally accelerate? What caused the airbag to fail to inflate? Here, the key inquiry is: What caused the well to fail? In *Nissan* and *Kia*, mere evidence that a negative event had occurred in other, similarly-equipped vehicles was not relevant to the question of whether the plaintiff's vehicle had a specific defect. Similarly, if Union Gas's evidence proved only that other wells failed using GB Tubulars products, it would be deficient. But Union Gas's evidence demonstrated not only that a specific part had failed in each incident but that it had failed in the same way with many of the same factors as were present in the case at hand. Additionally, although Union Gas's evidence regarding the other incidents was considerable, it was not so prolonged as to distract the jury's attention from what happened in the case at hand. *See Nissan*, 145 S.W.3d at 138. Union Gas claims it introduced evidence of other incidents to controvert GB Tubulars' claim that its product was not defective.

We conclude the trial court did not abuse its discretion in admitting the evidence of similar incidents. *See Downer*, 701 S.W.2d at 241–42. Accordingly, we overrule GB Tubulars' first issue.

### IV. Submission of Multiple Theories of Recovery

In its third issue, GB Tubulars contends that the trial court erred in submitting too many questions to the jury on multiple theories of recovery even though they were all based on essentially the same facts, resulting in juror confusion and irreconcilable findings.[12] GB Tubulars

---

sizes, and GB Tubulars does not cite any evidence that small differences in the diameter and weight affect the analysis.

12. Although GB Tubulars does not frame its third issue as a standard irreconcilable conflict issue, we note that if it had, it waived that complaint by not objecting before the trial court released the jury. *See, e.g., Triyar Cos., LLC v. Fireman's Fund Ins. Co.*, 515 S.W.3d 517, 530 & n.22 (Tex. App.—Houston [14th Dist.] 2017, pet. filed). Jury answers are considered in conflict if one of the answers in question would require a judgment in favor of the plaintiff, and the other would require a judgment in favor of the defendant. *Coastal Chem., Inc. v. Brown*, 35 S.W.3d 90, 99 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Appellate courts reconcile apparent conflicts in jury findings whenever reasonably possible. *See, e.g., Wooters v. Unitech Int'l, Inc.*, 513

does not cite to any place in the record where it made this argument below. *See* Tex. R. App. P. 33.1(a) (requiring as a prerequisite to appellate review that a complaint be made in the trial court by a timely and sufficiently specific request, objection, or motion); *Thota v. Young*, 366 S.W.3d 678, 689 (Tex. 2012) ("As we stated twenty years ago, the procedural requirements for determining whether a party has preserved error in the jury charge are explained by one basic test: 'whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.'") (quoting *State Dep't of Highways v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992)).[13]

We therefore reject the argument without further analysis and overrule the third issue.

## V. Proportionate Responsibility and the Award of Damages

■ In issue four, GB Tubulars asserts that the trial court erred in refusing to reduce the amount of damages awarded based on the jury's finding that Union Gas's own negligence was 45 percent responsible for its damages.[14] Union Gas elected recovery under its breach of express warranty cause of action. GB Tubulars concedes that the statutory proportionate responsibility scheme does not apply to breaches of express warranties. *See* Tex. Civ. Prac. & Rem. Code §§ 33.001–.004; *see also, e.g., Cressman Tubular Prods. Corp. v. Kurt Wiseman Oil & Gas, Ltd.*, 322 S.W.3d 453, 459-60 (Tex. App.—Houston [14th Dist.] 2010, pet denied). In *Cressman*, we explained that the statutory scheme expressly applies only in tort cases and that a breach of express warranties always sounds in contract. *Id.* (citing Tex. Civ. Prac. & Rem. Code § 33.002(a)(1) and *Med. City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 60-1 (Tex. 2008) (explaining that a claim based on an express warranty is, in essence, a contract action because it involves a party seeking damages based on an opponent's failure to uphold its end of the bargain.)).

Accordingly, instead of relying on the statutory scheme for application of proportionate responsibility in the express warranty context, GB Tubulars relies on two cases decided before chapter 33 was enacted: *Signal Oil & Gas Co. v. Universal Oil Products*, 572 S.W.2d 320 (Tex. 1978), in which the Texas Supreme Court applied a comparative fault scheme in an implied warranty case, and *Indust-Ri-Chem Laboratory, Inc. v. Par-Pak Co.*, 602 S.W.2d 282 (Tex. Civ. App.—Dallas 1980, no pet.), in which a court of appeals applied the *Signal Oil* scheme in an express warranty case. We note that the comparative fault

---

S.W.3d 754, 765 (Tex. App.—Houston [1st Dist.] 2017, pet. filed).

13. In *Thota*, the Texas Supreme Court explained that a general no-evidence objection to theories of recovery submitted in a broad-form question was sufficient to preserve a *Casteel* challenge to the question, i.e., an assertion that because there was no evidence on at least one cause of action, it tainted the entire submission because it could not be determined on appeal which tort the jury found had been committed. *Thota*, 366 S.W.3d at 689-91; *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000). The jury

charge in the present case was not in broad form, and GB Tubulars is not raising a *Casteel* challenge; therefore, GB Tubulars' objections to a few jury questions based on lack of evidence were insufficient to preserve a complaint that the court should not have submitted multiple causes of action to the jury based on the same essential facts.

14. The jury questions (numbers 15 and 16) concerning Union Gas's negligence were not tied to the jury's answer on any particular cause of action but were submitted along with other defensive questions.

scheme set forth in *Signal Oil* was replaced by the statutory proportionate responsibility scheme in chapter 33 of the Civil Practice and Remedies Code, which GB Tubulars acknowledges does not apply to breaches of express warranties.

 In *Signal Oil*, the supreme court concluded that Texas Business and Commence Code section 2.715, and its explanatory comment 5, revealed a legislative intent that a claimant's own fault or negligence should be considered when determining a recovery of consequential damages for a breach of an implied warranty. 572 S.W.2d at 327-28 (citing Tex. Bus. & Com. Code § 2.715 & cmt. 5).[15] But because the statute did not provide a framework for this comparative fault analysis, the court applied its own scheme. *Id.* at 328-29. Subsequently, as the supreme court explained in *JCW Electronics, Inc. v. Garza*, "[i]n 1987, the Legislature re-

placed the existing statutory and common law [comparative fault] schemes" when it passed chapter 33. *JCW*, 257 S.W.3d 701, 703 (Tex. 2008). Thus, the comparative fault scheme discussed in *Signal Oil* does not apply here because it no longer exists.[16] *See Dugger v. Arredondo*, 408 S.W.3d 825, 832 (Tex. 2013) (rejecting contention that specific common law doctrine could coexist with chapter 33). To the extent the *Indust-Ri-Chem* court correctly applied *Signal Oil* to a breach of an express warranty, it was effectively overruled when the legislature replaced the statutory and common law schemes with chapter 33, which excludes causes of action based on contract, such as the breach of an express warranty, from proportionate responsibility. *See* Tex. Civ. Prac. & Rem. Code § 33.002(a)(1); *Cressman*, 322 S.W.3d at 459-60.[17]

15. The Texas codification of the Uniform Commercial Code is found in the Business and Commerce Code.

16. This is not to say that plaintiffs bringing contract-based claims are not responsible for mitigating their damages. *See generally E.L. & Assocs., Inc. v. Pabon*, No. 14-15-00631-CV, 525 S.W.3d 764, 768-69, 2017 WL 2192881, at *4 (Tex. App.—Houston [14th Dist.] May 18, 2017, no pet. h.) (discussing applicability of doctrine of mitigation of damages in both tort and contract cases). Indeed, the breach of express warranty damages submission in this case instructed the jury that it should "not include ... any amount that you find Union Gas could have avoided by the exercise of reasonable care."

17. There is another reason for questioning the *Indust-Ri-Chem* analysis. The court in that case concluded that a comparative fault scheme applied to breach of express warranties because the *Signal Oil* court had applied it to a breach of an implied warranty and the *Indust-Ri-Chem* court could discern "no valid distinction, in this respect, between an express warranty and an implied warranty." *Indust-Ri-Chem*, 602 S.W.2d at 290 (citing *Signal Oil*, 572 S.W.2d at 328). As mentioned, however, it is now well-settled law in Texas

that while implied warranty actions can sound in tort law, express warranty actions are always based in contract law. *See Med. City*, 251 S.W.3d at 60-61 (holding that express warranty actions sound in contract); *Cressman*, 322 S.W.3d at 459-61 (discussing *Medical City* and applying proportionate responsibility to implied warranty claims but not express warranty claims in the same lawsuit); *see generally Signal Oil*, 572 S.W.2d at 327 (discussing "historical development of implied warranty with its roots in both contracts and tort"). The supreme court explained in *JCW* that "this Court, and many others, have historically included breach of implied warranty claims as part of the mix when comparing fault in tort-based litigation." 257 S.W.3d at 706-07. GB Tubulars does not cite and we have not discovered any Texas cases other than *Indust-Ri-Chem* including contract-based actions—such as breach of an express warranty—in the proportionate responsibility mix. *See Doncaster v. Hernaiz*, 161 S.W.3d 594, 604 (Tex. App.—San Antonio 2005, no pet.) ("The doctrine of proportionate responsibility is inapplicable because it applies only to causes of action based in tort. Here, the underlying suit lies in contract, not in tort; therefore, the doctrine is not applicable.").

Finding no merit in GB Tubulars' contention that the comparative fault scheme discussed in *Signal Oil* and *Indust-Ri-Chem* applies in the present case, we overrule GB Tubulars' fourth issue.

## VI. New Trial on Attorney's Fees

In its fifth and final issue, GB Tubulars contends that the trial court erred in granting Union Gas a new trial on attorney's fees. As discussed above, although the jury found GB Tubulars breached several warranties, a cause of action on which attorney's fees can be recovered, the jury found the amount of Union Gas's reasonable and necessary attorney's fees to be zero. *See generally Med. City*, 251 S.W.3d at 59-63 (discussing the recovery of attorney's fees in express warranty actions). Union Gas moved to accept the verdict into the record and shortly thereafter filed a motion for new trial asserting that "zero" was an improper finding on attorney's fees. The trial court granted the motion for new trial, and the parties agreed to retry the issue to the bench. The trial court subsequently determined that Union Gas was entitled to $950,000 in attorney's fees, as well as additional fees in the event GB Tubulars appealed.

GB Tubulars contends Union Gas waived any right to attorney's fees by (1) failing to request the trial court to send the jury back for further deliberations and (2) moving to accept the verdict. We disagree with both contentions.[18]

GB Tubulars asserts that, when a jury returns an incomplete or inconsistent verdict, the trial court may send the jury back for further deliberations, citing Tex. R. Civ. P. 295; *Fleet v. Fleet*, 711 S.W.2d 1, 2-3 (Tex. 1986) (incomplete verdict); *Tex. Emp. Ins. Ass'n v. King*, 346 S.W.2d 380, 382 (Tex. Civ. App.—Amarillo 1961, writ ref'd n.r.e.) (inconsistent verdict). The jury's verdict in this case, however, was neither incomplete (i.e., the jury answered all of the questions it was supposed to answer) nor internally inconsistent (i.e., there is no conflict between any answers). A jury can, in fact, properly find attorney's fees to be zero—even as to causes of action on which fees are recoverable—when the evidence supports that finding. *See, e.g., Meek v. Onstad*, 430 S.W.3d 601, 608 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("[A] fact finding that a reasonable fee for the necessary services of a party's attorneys in a case is zero dollars may be supported by sufficient evidence if there is evidence affirmatively showing that no attorney's services were needed or that any services provided were of no value.") (citing *Midland W. Bldg., L.L.C. v. First Serv. Air Conditioning Contractors, Inc.*, 300 S.W.3d 738, 739 (Tex. 2009) (per curiam), and *Cale's Clean Scene Carwash, Inc. v. Hubbard*, 76 S.W.3d 784, 787 (Tex. App.—Houston [14th Dist.] 2002, no pet.)). When a jury finds zero attorney's fees in such circumstances, the issue is analyzed as for sufficiency of the evidence. *See, e.g., Midland W. Bldg.*, 300 S.W.3d at 739;

18. In recent decisions, the Texas Supreme Court has permitted merits-based review in mandamus proceedings to the granting of new trial. *See generally In re Bent*, 487 S.W.3d 170, 175-77 (Tex. 2016) (discussing evolution of the law); *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 749 (Tex. 2013) (providing for merits-based review). Because we determine that GB Tubulars' arguments are meritless, we need not determine whether they are properly brought in a direct appeal. *But cf. United Scaffolding, Inc. v. Levine*, No. 13-14-00377-CV, 2015 WL 5157837, at *4 (Tex. App.—Corpus Christi Oct. 27, 2015, pet. granted) (mem. op.) (concluding recent supreme court mandamus rulings do not permit direct appeal of an order granting a new trial once that order has merged into a final judgment).

*Meek,* 430 S.W.3d at 608-10. The authorities GB Tubulars cites for incomplete or inconsistent verdicts are therefore inapposite, and its argument is without merit.

GB Tubulars additionally suggests Union Gas waived the attorney's fees issue when it moved to accept the verdict into the record without having raised any objection to the attorney's fees finding. GB Tubulars' brief, however, neither cites any authority supporting this assertion nor offers any specific explanation regarding why acceptance of the verdict into the record without objection waived the issue. *See* Tex. R. App. P. 38.1(i) (providing that an appellant's "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"). Challenges to the legal sufficiency of the evidence to support a jury finding may be raised in post-judgment motions, as Union Gas did here. *See Harris Cnty. Bail Bond Bd. v. Blackwood,* 41 S.W.3d 123, 127 (Tex. 2001). Finding no merit in either of GB Tubulars' attorney's fees arguments, we overrule its fifth issue.

We affirm the trial court's judgment.