**Affirmed and Opinion filed August 29, 2013.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-12-00789-CV

---

### DANIEL PLASENCIA D/B/A FT. BEND COLLISION AUTO REPAIR, Appellant

### V.

### JOHN BURTON, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF JOHN EDWARD BURTON, A MINOR DECEASED, Appellee

---

**On Appeal from the 268th District Court
Fort Bend County, Texas
Trial Court Cause No. 09-DCV-171816**

---

### O P I N I O N

After a bench trial, the trial court found appellant Daniel Plasencia d/b/a Ft. Bend Collision Auto Repair ("Plasencia") liable for the wrongful death of John Edward Burton and awarded $100,000 in actual damages to appellee John Burton, individually and as representative of the estate of John Edward Burton, a minor deceased ("Burton"). We affirm.

## BACKGROUND

On March 5, 2008, Burton brought his wife and two children to Plasencia's scrap yard. Burton was there to haul scrap metal away. Plasencia took Burton's children — John Edward, who was two years old, and Nicole, who was four — to one of the offices on the premises and left them there to play while Plasencia and Burton loaded scrap metal onto a trailer and Burton's wife painted another office. Sometime that evening, a Burton heard a loud noise, and he jumped off the trailer and ran to the room where his children were playing. He arrived to find John Edward dead, with his "brain on the floor" next to a shotgun. Plasencia had failed to inform Burton or his wife that he kept a loaded shotgun in that office.

Burton sued Plasencia for the wrongful death of John Edward, seeking $1 million in actual damages. Just before the trial began, Plasencia filed a motion for continuance that the trial court denied. After a bench trial, the trial court concluded that Plasencia was liable and awarded Burton $100,000 "in actual damages, for mental anguish, loss of companionship and loss of society." Plasencia requested findings of fact and conclusions of law and filed a "Motion for New Trial and Motion to Modify, Correct or Reform the Judgment," arguing that (1) "The Record is Devoid of Legally and Factually Sufficient Evidence to Support the Judgment;" (2) "There was No Evidentiary Support for the Damages Award;" (3) "The Damages are Excessive;" (4) "Defendant's Motion for Continuance should have been granted;" (5) "The 'Final' Order is Not Final because it does not dispose of all parties and if no new trial is granted, the judgment should be modified, corrected or reformed;" and (6) "The proper remedy is a new trial." The trial court signed findings of fact and conclusions of law on August 31, 2012. This appeal followed.

In two issues on appeal, Plasencia argues that the evidence is both legally

and factually insufficient to support the trial court's (1) liability finding, and (2) damages award.

## ANALYSIS

Legal insufficiency challenges may be sustained only when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362-63 (1960)).

We must consider evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822. If the evidence allows only one inference, neither the factfinder nor the reviewing court may disregard that evidence. *Id.* "[T]he traditional scope of review does not disregard contrary evidence in every no evidence review if there is no favorable evidence (situation (a) above), or if contrary evidence renders supporting evidence incompetent (situation (b) above) or conclusively establishes the opposite (situation (d) above)." *Id.* at 810-11. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then the factfinder must be allowed to do so. *Id.* at 822. Accordingly, the ultimate test for legal sufficiency always must focus on whether the evidence would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827. Legal sufficiency review in the proper light must credit favorable evidence if reasonable people could do so, and must disregard contrary evidence unless reasonable people could not do so. *Id.* The reviewing court cannot substitute its

3

judgment for that of the trier of fact if the evidence falls within this zone of reasonable disagreement. *Id.* at 822. A trial court's findings are reviewable for legal sufficiency of the evidence by the same standards that are applied in reviewing evidence supporting a jury's answer. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994).

In reviewing factual sufficiency, we must consider and weigh all the evidence. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). We can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Id.* As with legal sufficiency, a trial court's findings are reviewable for factual sufficiency of the evidence by the same standards that are applied in reviewing evidence supporting a jury's answer. *Catalina*, 881 S.W.2d at 297.

## I.  Liability

Plasencia argues that the evidence was insufficient to support the trial court's finding of liability because (1) "[n]o evidence was presented that appellant had a legal duty of care to appellee's child," and (2) "it is the parent who has the duty to supervise the minor child."

### A.  Premises Liability

The Texas Wrongful Death Statute provides that "[a] person is liable for damages arising from an injury that causes an individual's death if the injury was caused by the person's or his agent's or servant's wrongful act, neglect, carelessness, unskillfulness, or default." Tex. Civ. Prac. & Rem. Code Ann. § 71.002(b) (Vernon 2008). Plasencia's conduct in placing a two-year-old and a four-year-old in a room in which a loaded shotgun was within their reach, and in

4

failing to inform Burton or his family members of the loaded shotgun's presence in the room where the children were playing, was the basis of Burton's pleadings and the trial court's judgment. Therefore, we are presented with a question of premises liability.

Premises liability is a special form of negligence in which the premises owner's duty generally is determined by the plaintiff's status as an invitee, licensee, or trespasser. *Taylor v. Louis*, 349 S.W.3d 729, 734 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *see W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). An invitee enters land with the owner's knowledge and for the mutual benefit of both. *Mayer v. Willowbrook Plaza Ltd. P'ship*, 278 S.W.3d 901, 909 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *Am. Indus. Life Ins. Co. v. Ruvalcaba*, 64 S.W.3d 126, 134 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)). A licensee enters and remains on land with the owner's consent and for the licensee's own convenience, on business with someone other than the owner. *Mayer*, 278 S.W.3d at 910. A trespasser enters another's property without lawful authority, permission, or invitation. *Id.*

If a person is an invitee, the property owner has a duty to use reasonable care to protect that person from known conditions that create an unreasonable risk of harm and conditions that should be discovered by the exercise of reasonable care. *Id.* If a person is a licensee, the property owner has a duty to refrain from injuring that person willfully, wantonly, or through gross negligence; further, the owner who has actual knowledge of a dangerous condition unknown to the licensee has a duty to warn the licensee or make safe the dangerous condition. *Id.* If a person is a trespasser, the property owner has a duty not to cause injury willfully, wantonly, or through gross negligence. *Id.*

As the owner of the scrap yard, Plasencia owed a duty of care to Burton and

his family; the scope of that duty was determined by the family members' status as invitees, licensees, or trespassers. *See id.* It is undisputed that Burton's family had permission to be at Plasencia's scrap yard; none of the family members were trespassers. We need not determine whether John Edward was an invitee or licensee, however, if (1) Plasencia failed to warn the Burtons, and (2) the loaded shotgun was a dangerous condition that posed an unreasonable risk of harm. *See Jenkins v. Occidental Chem. Corp.*, No. 01-09-01140-CV, __ S.W.3d __, 2013 WL 3354002, at *18 (Tex. App.—Houston [1st Dist.] July 2, 2013, no pet. h.) ("[T]he law imposes a duty on a premises owner or operator to take action to make the premises reasonably safe or to warn invitees and licensees of an unreasonable danger.").

## 1.    Failure to Warn

Burton testified that he was unaware of any guns being present in the scrap yard when he allowed Plasencia to take his children into one of the offices on the premises. Plasencia's testimony demonstrated that he knew about the presence of the loaded shotgun in the office where he placed the children and that he did not remember to tell the Burtons about it:

> And I do — and I do — I did kept a shotgun. I don't — I don't remember it being loaded, but it was always facing down; the barrel was facing down against the wall behind a cabinet. It was hidden. It was out of sight. It was not over there accessible for anybody to see.

> And during this whole time, I forgot completely, forgot completely, completely. It was not on my main office. It's what I call my lunch area. And that I keep for safety for my employees because previously we were robbed before.

When Burton's attorney asked if Plasencia knew the gun was loaded, Plasencia answered, "That, I don't — That, I don't remember, but apparently probably so,

6

yes, sir."

We conclude that the evidence is legally and factually sufficient to support the finding that Burton did not know about the shotgun, but that Plasencia did and failed to warn Burton about it. *City of Keller*, 168 S.W.3d at 822; *Golden Eagle Archery*, 116 S.W.3d at 761.

### 2.      Unreasonable Risk of Harm

A condition poses an unreasonable risk of harm for premises defect purposes when there is a "sufficient probability of a harmful event occurring that a reasonably prudent person would have foreseen it or some similar event as likely to happen." *Plainview Motels, Inc. v. Reynolds*, 127 S.W.3d 21, 29 (Tex. App.—Tyler 2003, pet. denied) (quoting *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 556 (Tex. 2002). Foreseeability does not require that the exact sequence of events that produced an injury be foreseeable. *Plainview Motels*, 127 S.W.3d at 29. Instead, only the general danger must be foreseeable. *Id.*

An unreasonable risk of harm can be created by seemingly innocuous items; in *Plainview Motels*, the risk arose from a warehouse store's mirror display:

> Surplus Sales's display consisted of multiple mirrors stacked vertically, one against the other and leaning at a slight angle against a two-by-four support post. Although the total number of mirrors was unclear, their combined weight was significant, which is apparent from the fact that it was sufficient to trap an adult male and, ultimately, required the strength of between three and four adults to be removed. The nature of Surplus Sales's business is that customers will view items in one of Surplus Sales's warehouses, help themselves to such items as they may desire, and transport such items to the checkout area of the facility.

*            *            *

The jury could reasonably determine that a group of thirty-pound

7

mirrors leaning against a support column could potentially fall. Moreover, given the nature of Surplus Sales's business, it is a reasonable deduction from the evidence that, no matter how stable the stack is, a customer desiring a mirror deep within the stack could seek to move some of the mirrors around to look at others or remove a mirror that strikes his fancy.

*Id.* at 29-30 (footnotes omitted).

Moreover, though the same degree of care is owed to both adults and children, different precautions must be taken for children because they "have a tendency to indulge in childish impulses to play and climb." *Wal-Mart Stores, Inc. v. Lerma*, 749 S.W.2d 572, 575 (Tex. App.—Corpus Christi 1988, no writ). In *Lerma*, a three-year-old girl was injured by a clothing rack that fell on her after she swung from it. *Id.* at 573-74. After noting that Wal-Mart employees knew that the height of the rack could be raised beyond the reach of a small child, the court reasoned that "[a] trier of fact could have found that a clothing rack, though not normally dangerous, presented an unreasonable risk of harm to children when it was adjusted at a height where a mere three-year-old could reach up and swing from it." *Id.* at 576.

Plasencia does not dispute that placing a two-year-old and a four-year-old in a room with an unsecured, loaded shotgun within their reach creates an unreasonable risk of danger. *Cf. Kennedy v. Baird*, 682 S.W.2d 377, 378-79 (Tex. App.—El Paso 1984, no writ) (considering liability for negligent entrustment of a firearm). A loaded shotgun left within the reach of a two-year-old and a four-year-old presents at least as much risk of harm as a mirror display or a clothing rack. *Cf.* Tex. Penal Code Ann. § 1.07(17)(A) (Vernon Supp. 2012) (defining a firearm as a deadly weapon). We conclude that the evidence is legally and factually sufficient to support the finding that the presence of a loaded shotgun left within the reach of a two-year-old and a four-year-old created an unreasonable risk of

8

harm. *City of Keller*, 168 S.W.3d at 822; *Golden Eagle Archery*, 116 S.W.3d at 761. Accordingly, Plasencia breached the duty he owed the Burtons as either invitees or licensees. *See Jenkins*, 2013 WL 3354002, at *18.

### B.    Parental Liability

The Texas Family Code provides that "[a] parent of a child has . . . the duty of care, control, protection, and reasonable discipline of the child." Tex. Fam. Code Ann. § 151.001(a)(2) (Vernon 2008). Plasencia argues that the death of John Edward was a dire consequence of the Burtons' breach of their parental duty, and that "dire consequences do not justify an improper shift of the duty of care to [Plasencia]." Plasencia offered no evidence in support of this theory in the trial court and cites to a single case for support in his appellate briefing: *McCullough v. Godwin*, 214 S.W.3d 793 (Tex. App.—Tyler 2007, no pet.). *McCullough* is distinguishable because it is an ordinary negligence case, not a premises liability case, and it dealt with fundamentally different facts.

In *McCullough*, a father took his minor son swimming on a lake with a group that included several adults and several children. *Id.* at 798. The father and son traveled to the swimming spot on two separate boats; the son traveled on a boat operated by Brandon and Shellie Stairs, who provided the son with a life preserver. *Id.* When both boats arrived at the swimming spot, the father removed his son from the Stairses' boat and took off his son's life preserver. *Id.* The father visited with other adults, listened to music, and consumed alcoholic beverages while the children played. *Id.* At one point, the father told the son to stop playing a game in which he hid under an inner tube owned by the Stairses because the father could not see him. *Id.* at 798-99. About an hour after the son had last been seen by anyone, Shellie Stairs found his body beneath the surface of the water. *Id.* at 799. The son was put on life support but eventually died. *Id.*

9

To support his argument that the Burtons breached their parental duty to protect John Edward, Plasencia quotes a passage from *McCullough* in which the court considered whether the duty of care, control, and protection of the son should be imposed on the father or on the Stairses:

> [A] parent's right to care, custody, and management of his child is constitutional in nature and considered a precious fundamental liberty interest. Indeed, a parent's duty to supervise his child is significant, and a breach of such a duty can undoubtedly have dire consequences. However, the law does not favor shifting this statutorily imposed responsibility from the parent absent unique circumstances not present in the case at hand.

*Id.* at 808 (citations omitted). The court went on to consider whether the father or the Stairses had superior knowledge of the risk and to conclude that the father had knowledge of all risks involved with the son's water play. *Id.* Ultimately, the court held that the Stairses did not owe the child a legal duty. *Id.* at 809.

Plasencia argues that the Burtons should have known that a scrap yard is generally not a safe place, but he does not argue that the Burtons had any knowledge of the loaded shotgun. Unlike the Stairses, Plascencia owned the premises where the child was playing and thus owed the duties described above. Further, while the Stairses actively attempted to keep the son safe by supplying him with a life preserver, Plasencia did nothing to minimize the danger posed by the loaded shotgun or to warn of its presence. Accordingly, the evidence supports the trial court's determination that a duty existed and was breached by Plasencia. Plasencia did not plead the Burtons' alleged negligence as a defense; nor did he request findings on the Burtons' negligence or proportionate responsibility. Thus, the Burtons' alleged negligence cannot excuse Plasencia from liability.

In summary, Plasencia knew the Burtons' children were playing unsupervised in an office in which he had placed them, and he kept a loaded and

unsecured shotgun in the office in which the children were playing. Plasencia neither warned the Burtons about the shotgun nor removed the shotgun while the children were playing. Viewing the evidence in the light most favorable to the factfinders determination, we conclude that reasonable and fair-minded people could reach the conclusion that the death of John Edward resulted from a breach of the duty of care owed by Plasencia, and we cannot conclude that the liability finding is so against the great weight and preponderance of the evidence so that it is manifestly unjust.

Therefore, the evidence is legally and factually sufficient to support the liability finding. *City of Keller*, 168 S.W.3d at 822; *Golden Eagle Archery*, 116 S.W.3d at 761.

We overrule Plasencia's first issue.

## II. Damages

In his second issue, Plasencia argues that "[t]here was no evidence in the record at all to support any damage award[,] and the judgment should be set aside and a new judgment entered in favor of [Plasencia], or a new trial granted."

In its final order, the trial court awarded Burton $100,000 "in actual damages, for mental anguish, loss of companionship and loss of society." Plasencia correctly notes that Burton did not specifically plead loss of companionship or loss of society.[1] Burton also did not submit any evidence about the relationship he had with his son that could support an award of damages for loss of companionship or society; this appeared to be a conscious strategy. At trial, the following exchange occurred between the court and Burton's trial counsel, John Ezell:

---

[1] In his original petition, Burton alleged that he had "sustained damages, loss of consortium, grief and mental anguish" as a result of John Edward's death.

11

THE COURT: Counsel, what am I to base that $1 million [in requested damages] on? I have no evidence as to monetary damages. We have no — you have put on no medical costs, put on no — and obviously, with a 2-year-old, you're not going to be able to put on lost wages or future wages. What am I to base a million dollars on? There's no malice in this case, so exemplaries don't apply. What am I to base a judgment on, a damage judgment on?

MR. EZELL: On the loss of a child, sir. On the loss of a child.

\* \* \*

MR. EZELL: Judge, we have presented to the Court the loss that the father suffered and the losses to him. Those are the — that is the evidence. It's the only evidence that we have, Judge.

Based on the evidence submitted to the trial court, we focus our analysis on mental anguish damages.

In wrongful death cases, mental anguish is the emotional pain, torment, and suffering that the plaintiff would, in reasonable probability, experience from the death of a family member. *Moore v. Lillebo*, 722 S.W.2d 683, 688 (Tex. 1986). Damages for mental anguish are intended to compensate the beneficiary for the deleterious effect that the wrongful death had on the beneficiary. *See id.*; *Thomas v. Uzoka*, 290 S.W.3d 437, 455-56 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). To recover mental anguish, a claimant must demonstrate a high degree of mental suffering beyond disappointment, anger, resentment, or embarrassment, although mental anguish may include all of these emotions. *Thomas*, 290 S.W.3d at 455. Thus, proof of mental anguish can include painful emotions such as grief, severe disappointment, indignation, wounded pride, shame, despair, public humiliation, or a combination of any or all of those feelings. *Id.* As compared with loss of companionship and society, which emphasizes the removal of positive benefits that the beneficiary once enjoyed but which were taken away by the

12

wrongful death, mental anguish focuses on the negative impact of the wrongful death on the beneficiary. *Id.* at 455-56.

For mental anguish claims arising out of the wrongful death of a plaintiff's child, the supreme court has noted the reasoning of the United States Court of Appeals for the Eighth Circuit while interpreting Arkansas law:

> [w]e do not think that Arkansas law requires that parents of a deceased child necessarily make a public exhibition of their grief before or during trial. . . . We are not convinced that mental anguish necessarily manifests itself objectively to the world, nor do grief stricken parents need to offer evidence of physical symptoms such as sleeplessness, weight loss, nervousness, personality changes, and the like. Mental anguish represents a deep inner feeling of pain and hurt often borne in silence. We are satisfied from our reading of the Arkansas cases that parents, such as the Connells, are entitled to have the issue of mental anguish submitted to the jury on the basis of the emotional impact suggested by the circumstances surrounding their loss. We are convinced that assessment of the resulting grief is a task for which juries have traditionally been considered well-suited, and in which they can properly be expected to draw upon their own experience and empathy.

*Moore*, 722 S.W.2d at 686 (quoting *Connell v. Steel Haulers, Inc.*, 455 F.2d 688, 691 (8th Cir. 1972)).

However, evidence of the existence of compensable mental anguish is not enough; there must also be some evidence to justify the amount awarded. *Saenz v. Fid. Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). While the impossibility of any exact evaluation of mental anguish requires that factfinders be given a measure of discretion in finding damages, that discretion is limited. *Id.* Factfinders cannot simply pick a number. *Id.* They must find an amount that, in the standard language of the jury charge, "would fairly and reasonably compensate" for the loss. *Id.*

In *Thomas*, this court considered the sufficiency of the evidence to support damages awarded in a wrongful death suit filed by the wife ("Ugochi") of a taxi cab driver ("Chris"). *Thomas*, 290 S.W.3d at 455-56. The jury had awarded the wife $100,000 for past mental anguish and $50,000 for future mental anguish, as well as awards totaling $550,000 for past and future loss of companionship and society. *Id.* We concluded:

> The jury was presented with adequate evidence of the mental anguish and loss of companionship and society that Ugochi suffered because of her husband's death. The jury had the benefit of observing Ugochi as she testified at some length about the relationship she shared with Chris and the impact of his death on her. Among other things, she testified that they had made plans for the future. Ugochi intended to return to Houston after graduation and move into a "good apartment" with Chris. She had plans to follow through with a formal wedding ceremony inasmuch as they were initially married in an informal occasion at the courthouse. They also planned to have at least two, and possibly as many as four, children together.

*Id.* at 456.

Here, Burton did not testify about his relationship with John Edward, and he did not testify about any future plans he had made with his son. Any such testimony would have related to the removal of the positive aspects of their relationship — that is, Burton's loss of companionship and society. *See id.* at 455-56. Burton did testify to the grisly details of discovering John Edward's body, however; he testified that, after hearing the gunshot, "I jumped off the trailer, went to the office, and I seen my son's brain on the floor. . . . I seen the shotgun on the floor as I picked up my son and took him out." The trial court had the opportunity to observe Burton and assess his emotional demeanor during his testimony; this afforded some insight into the mental anguish Burton had suffered. *See id.*

In *Sanchez v. Schindler*, 651 S.W.2d 249 (Tex. 1983), the supreme court

14

rejected the pecuniary loss rule as the measure of damages for the death of a child because "[t]he real loss sustained by a parent is not the loss of any financial benefit to be gained from the child, but is the loss of love, advice, comfort, companionship, and society." *Id.* at 251. "The destruction of the parent-child relationship results in mental anguish, and it would be unrealistic to separate injury to the familial relationship from the emotional injury." *Id.* at 253. The *Sanchez* court upheld a jury award of $102,500 for mental anguish to the mother of a child killed in a collision with a pick-up truck. *Id.* at 250. The mother was not present when the collision occurred, but after her son was rushed to a hospital for medical treatment, she "caught glimpses of his bloody legs" through a hospital doorway. *Id.*

Viewing the evidence in the light most favorable to the verdict, we conclude that reasonable and fair-minded people could conclude that $100,000 would fairly and reasonably compensate Burton for the damages he suffered as a result of John Edward's death, and we cannot conclude that the award is so against the great weight and preponderance of the evidence so that it is manifestly unjust.

Therefore, the evidence is legally and factually sufficient to support the damages award. *City of Keller*, 168 S.W.3d at 822; *Golden Eagle Archery*, 116 S.W.3d at 761.

We overrule Plasencia's second issue.

15

## CONCLUSION

Having overruled both of Plasencia's issues in this appeal, we affirm the judgment of the trial court.


/s/     William J. Boyce
             Justice


Panel consists of Justices Boyce, Jamison, and Busby.