**Affirmed in Part, Reversed and Rendered in Part, and Memorandum Opinion filed April 22, 2021.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-19-00794-CV

---

### HECTOR ARGUETA, JR. D/B/A ARGUETA BUS SERVICE, Appellant

### V.

### MYSTERIE GUITERREZ, AS NEXT FRIEND OF M.C., A MINOR CHILD, Appellee

---

**On Appeal from the 295th District Court
Harris County, Texas
Trial Court Cause No. 2014-59615**

---

## M E M O R A N D U M   O P I N I O N

When Max[1] was five years old, he fell out of a school bus emergency exit while the bus was driving through a residential neighborhood in Houston. Max sustained a skull fracture and a subdural hematoma. Appellee Mysterie Gutierrez, Max's mom, sued the school bus operator, appellant Hector Argueta, Jr. d/b/a

---

[1] To protect the child's identity, we refer to him using a pseudonym.

Argueta Bus Service ("Argueta"). Gutierrez asserted a claim for negligence and the parties proceeded to trial.

The jury found in favor of Gutierrez and assessed approximately $1.9 million in damages. The trial court entered judgment on the jury's verdict and Argueta appealed. For the reasons below, we affirm the trial court's judgment in part and reverse and render in part.

## BACKGROUND

On the afternoon of September 18, 2014, Michael Jorissen was driving a school bus and picked up approximately 20 children from an east Houston elementary school. While Jorissen was driving his route, a child ran up the bus aisle and told him "a little boy had fallen out." Jorissen stopped the bus, walked several houses back, and found Max lying on his back in the street. Jorissen carried Max back to the bus and called his wife, Priscilla,[2] to pick up Max and take him to his great-grandmother's workplace.

Max was dropped off with his great-grandmother and, later that afternoon, Gutierrez took him to the emergency room. Max was transferred via ambulance to another hospital, where he was diagnosed with a skull fracture and subdural hematoma.

Gutierrez sued Argueta and the parties proceeded to a jury trial in May 2019. The jury heard testimony from eight witnesses, including Gutierrez, Jorissen, Priscilla, Max's great-grandmother, and four medical experts. In its verdict, the jury answered "Yes" to the only liability question, which inquired whether Argueta's negligence "proximately caused the occurrence in question." The jury assessed the following damages:

---

[2] Because Priscilla shares the same last name as her husband, we refer to her by her first name to avoid confusion.

| | |
|---|---|
| Physical pain and mental anguish sustained in the past by Max. | $300,000 |
| Physical pain and mental anguish that, in reasonable probability, Max will sustain in the future. | $300,000 |
| Physical impairment sustained in the past by Max. | $5,000 |
| Physical impairment that, in reasonable probability, Max will sustain in the future. | 0 |
| Medical care expenses that, in reasonable probability, will be incurred on behalf of Max in the future from the time of trial until Max reaches the age of 18 years. | $288,000 |
| Medical care expenses that, in reasonable probability, Max will incur after he reaches the age of 18 years. | $1,000,000 |

The trial court signed a final judgment on July 9, 2019, awarding Gutierrez the amounts assessed in the jury's verdict. Argueta filed a motion for new trial and a motion for judgment notwithstanding the verdict, both of which were denied. Argueta timely appealed.

### ANALYSIS

Argueta asserts seven issues on appeal. In his first issue, Argueta challenges the trial court's evidentiary ruling with respect to the expert witnesses' testimony on the costs of Max's future medical care expenses. Argueta also challenges the legal and factual sufficiency of the evidence supporting the jury's findings that (1) Argueta was negligent, and (2) Argueta's negligence caused the injuries claimed. Argueta's remaining issues challenge the legal and factual sufficiency of the evidence with respect to several of the jury's damage assessments.

3

We consider these issues individually, beginning with Argueta's challenge to the trial court's evidentiary ruling.

## I.    Evidentiary Issue

In its first issue, Argueta asserts that Gutierrez's "failure to disclose information about any amount and method of calculating alleged future medical damages made any evidence about such damages inadmissible." This argument is based on Gutierrez's responses to Argueta's requests for disclosure. One request for disclosure asked for "the amount and any method of calculating economic damages." Gutierrez responded, in relevant part, as follows:

> Plaintiff also intends to offer evidence of medical expenses in the future at the trial of this case. The amount and necessity of Plaintiff's future medical expenses may be determined by the jury in its sole discretion, with or without expert testimony, not to exceed the sum of $250,000. Any expert testimony of future medical expenses . . . will be elicited from one or more of Plaintiff's treating physicians, who are identified in Plaintiff's most recent response to Request for Disclosure.

According to Argueta, Gutierrez did not provide any additional information disclosing the amount and method of calculating Max's future medical expenses. This failure to disclose, Argueta argues, rendered such evidence subject to mandatory exclusion. In the alternative, Argueta asserts the award of future medical expenses should be limited by Gutierrez's representation that the amount sought would not exceed $250,000.

Under the Texas Rules of Civil Procedure, a party may request disclosure of "the amount and any method of calculating economic damages." *See* Tex. R. Civ. P. 194.2(b)(4). Further,

> [a] party who failed to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence that material or information that was not timely disclosed . . . unless the

4

court finds that:

(1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or

(2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.

Tex. R. Civ. P. 193.6(a); *see also Reservoir Sys., Inc. v. TGS-NOPEC Geophysical Co.*, 335 S.W.3d 297, 309-11 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (trial court did not err in excluding all evidence of damages on the defendant's counterclaims because the defendant "failed to timely provide evidence of its damages"). This rule is mandatory and the penalty — exclusion of evidence — is automatic absent a showing of (1) good cause or (2) lack of unfair surprise or unfair prejudice. Tex. R. Civ. P. 193.6(b); *Reservoir Sys., Inc.*, 335 S.W.3d at 311. The burden is on the party offering the undisclosed evidence to establish good cause or lack of unfair surprise or unfair prejudice. *Reservoir Sys., Inc.*, 335 S.W.3d at 311.

A Rule 193.6 challenge must be raised in the trial court and a ruling must be secured to preserve the issue for appellate review. *See* Tex. R. App. P. 33.1(a); *see also Petroleum Workers Union of the Republic of Mex. v. Gomez*, 503 S.W.3d 9, 36 (Tex. App.—Houston [14th Dist.] 2016, no pet.). We review the trial court's evidentiary ruling for an abuse of discretion. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000). A trial court abuses its discretion when it acts arbitrarily or unreasonably or without reference to any guiding principles. *Harpst v. Fleming*, 566 S.W.3d 898, 904 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Under this standard, we uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Merrill v. Sprint Waste Servs. LP*, 527 S.W.3d 663, 669 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

Here, Argueta raised this issue in the trial court before the beginning of voir dire and asked the trial court to exclude Gutierrez's "evidence of future medical costs/charges" because the evidence "was never . . . provided to [Argueta] in any discovery responses or expert reports, et cetera." After some brief discussion of the issue, the trial court requested additional briefing and told the parties it would "hold on ruling." Both parties filed trial briefs addressing the issue. Before both experts testified, Argueta again objected that it was not provided in discovery. The trial court overruled Argueta's objection.

The trial court's ruling on Argueta's objection does not constitute an abuse of discretion. Argueta attached to its trial brief the reports it received from Gutierrez's three medical experts. The experts' reports were issued in April 2016 — approximately three years before trial. The reports conclude that Max has difficulties with verbal comprehension and language as well as problems with mood regulation. The reports recommend an ongoing course of treatment for Max including neuropsychological evaluations and testing, treatment from a child psychiatrist, family psychiatric intervention, and medication. Based on these expert reports and Gutierrez's response to Argueta's requests for disclosure, the trial court reasonably could have concluded Gutierrez met her burden to disclose sufficient information regarding Max's future medical expenses. *See* Tex. R. Civ. P. 193.6, 194.2.

In the alternative, Argueta argues that Gutierrez's future medical expenses recovery should be limited by her representation that amounts sought would not exceed $250,000. Argueta does not cite any case law or other authority (and we have found none) supporting its proposition that a damage cap should be imposed in these circumstances. *See Hernandez v. Hernandez*, No. 05-13-01219-CV, 2014 WL 5337988, at *3-4 (Tex. App.—Dallas Oct. 20, 2014, no pet.) (mem. op.)

6

(rejecting the appellant's argument that damages should have been capped at the amount disclosed but noting also that appellant failed to object to the evidence of damages); *but see Bishop Abbey Homes, Ltd. v Hale*, No. 05-14-01137-CV, 2015 WL 9167799, at *19 (Tex. App.—Dallas Dec. 16, 2015, no pet.) (mem. op.) (ordering a remittitur of damages to the amount stated in the request for disclosures due to insufficient evidence).

Argueta also argues legal and factual sufficiency issues with respect to the future medical damages. Given the fact that we find only sufficient evidence of future medical damages in the amount of $288,000 (in part II.C., below), we decline to impose a further cap.

We overrule Argueta's evidentiary issue.

## II.    Legal and Factual Sufficiency Issues

Argueta raises both legal and factual sufficiency challenges with respect to the jury's findings.

### A.    Standards of Review

When reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable fact finder could do so and disregard contrary evidence unless a reasonable fact finder could not do so. *Id*. at 807, 827. We apply this standard mindful that the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Id*. at 819, 822.

We sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of a vital fact; (2) the court is barred by rules of law or of

7

evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 603 (Tex. 2010) (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). More than a scintilla of evidence exists when the evidence supporting the finding rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Coffman v. Melton*, 448 S.W.3d 68, 71 (Tex. App.—Houston [14 Dist.] 2014, pet. denied).

When reviewing a factual sufficiency challenge, we consider and weigh all of the evidence pertinent to the challenged finding. *Noble Drilling (US) LLC v. Deaver*, 596 S.W.3d 482, 487 (Tex. App.—Houston [14th Dist.] 2020, no pet.). We will set aside the challenged finding only if "the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of the evidence, that the answer should be set aside and a new trial ordered." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016).

## B. Liability Findings

A cause of action for negligence consists of three elements: (1) a legal duty owed by one party to another, (2) a breach of that duty, and (3) damages proximately caused by that breach. *Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex. 1998). Incorporating these elements, Question No. 1 asked the jury: "Did the negligence, if any, of [Argueta] proximately cause the occurrence in question?" Question No. 1 also provided the following instructions:

> "Negligence," when used with respect to the conduct of Argueta Bus Services, means failure to use a high degree of care, that is, failing to do that which a very cautious, competent, and prudent person would have done under the same or similar circumstances or doing that

8

which a very cautious, competent, and prudent person would not have done under the same or similar circumstances.

"High degree of care" means that degree of care that would have been used by a very cautious, competent, and prudent person under the same or similar circumstances.

"Proximate cause" means a cause that was a substantial factor in bringing about an occurrence, and without which cause such occurrence would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using a high degree of care would have foreseen that the occurrence, or some similar occurrence, might reasonably result therefrom. There may be more than one proximate cause of an occurrence.

The jury responded "Yes" to Question No. 1.

Question No. 2 was predicated on an affirmative response to Question No. 1 and asked the jury: "[w]hat sum of money, if paid now in cash, would fairly and reasonably compensate [Max] for his injuries, if any, that resulted from the occurrence in question?" The jury assessed $1,893,000 in damages across six separate categories.

Challenging these responses, Argueta asserts the evidence is legally and factually insufficient to support the jury's findings that (1) Argueta was negligent, and (2) a causal connection exists between the incident and Max's claimed injuries. Where, as here, the parties have not objected at trial to the substance of the law set forth in the jury question, we review Argueta's sufficiency challenges in light of the legal standards contained in the charge. *See, e.g., GB Tubulars, Inc. v. Union Gas Operating Co.*, 527 S.W.3d 563, 568 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). We consider each challenge separately.

### 1. Negligence

Jorissen was the first witness to testify regarding the events surrounding the incident. At the time the incident occurred, Jorissen had been driving a school bus

9

for approximately two years. Before beginning his afternoon bus route on the day in question, Jorissen said he completed a "pre-trip inspection" of the bus which consisted of "[c]hecking of lights, horn, wheels, emergency equipment, emergency exits, [and] any puddling of fluids." For the emergency exits, Jorissen testified that he ensured they could be properly opened and closed.

After inspecting the school bus, Jorissen said he picked up Max and approximately twenty other children from an elementary school. Jorissen testified that the children had assigned seats in the bus indicated by tape above the windows; according to Jorissen, he confirmed the children were all in their assigned seats before beginning his route. When he was reviewing pictures of the bus's interior that were admitted into evidence, Jorissen did not see the taped seat assignments. Jorissen also said the bus contained a video recorder "that was pointed at the students" but it had "never been working."

Jorissen said the students would "regularly" switch seats while he was driving and that Max previously had "move[d] around the bus on occasion." Jorissen testified that Max's assigned seat was approximately ten rows in front of the emergency exit row. On the day of the incident, Jorissen did not recall seeing Max "go from up at the front of the bus, walk back ten seats and get into the emergency row[.]" When asked if it was "okay for a five-year-old to be sitting in — sitting next to the emergency exit", Jorissen responded "[n]o."

Jorissen testified that he was driving the bus when a child "ran up the aisle" and said "a little boy had fallen out." Jorissen stopped the bus and walked "about three houses" back to where Max was lying on his back in the street. According to Jorissen, he asked Max "if he was hurt" and Max said "no". Jorissen carried Max back to the school bus and waited for Priscilla to pick up Max.

Jorissen said he did not "have an understanding of how it was that [Max] fell

10

out of the school bus." Jorissen said he asked the children on the bus how Max fell out of the emergency exit door; the children said "[t]hey don't know, that it must have opened on its own." When asked if he was "a hundred percent responsible" for Max's accident, Jorissen responded: "yes, I am."

Jorissen was also questioned at length regarding an interior metal latch installed on the bus's emergency exit door after Max's incident.[3] Jorissen said he did not know who installed the metal latch and denied that the latch was installed because the emergency exit door "would swing open without having that latch on there." According to Jorissen, he was told the latch was installed to deter vandalism and theft. Jorissen acknowledged that the latch would make it more difficult for emergency responders to open the emergency exit door if needed. Because of this, Jorissen agreed that driving with the metal latch closed was "against the law, according to [his] understanding of the law."

Priscilla testified as Argueta's corporate representative. Priscilla's mother and brother owned the company and Priscilla and Jorissen worked as bus drivers. Priscilla testified that the bus involved in the incident was purchased from a "certified collision company" for $4,500; an exhibit admitted during Priscilla's

---

[3] Texas Rule of Evidence 407 provides as follows with respect to evidence of subsequent remedial measures:

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; culpable conduct; a defect in a product or its design; or a need for warning or instruction.

> But the court may admit this evidence for another purpose, such as impeachment or — if disputed — proving ownership, control, or the feasibility of precautionary measures.

Tex. R. Evid. 407. Argueta did not raise in the trial court or on appeal any Rule 407 objections with respect to evidence of the interior metal latch installed on the emergency exit door after the incident in question. The jury was not instructed that it could consider this evidence only for a limited purpose. Accordingly, our sufficiency analysis takes into account this evidence and any reasonable inferences that may be drawn therefrom.

testimony showed the bus was a 1995 model.

When asked about the cause of the incident, Priscilla said "nobody knows what happened. What is for certain is that somebody had to have opened the emergency hatch." Priscilla testified that this kind of accident had not happened before. Priscilla agreed that Max should have been in his assigned seat rather than in the emergency exit row and that it was Jorissen's "responsibility to make [Max] sit in the appropriate seat."

Priscilla also said the interior metal latch was installed on the bus's emergency exit door "a couple weeks after [Max] fell out of that emergency door." Priscilla testified that the latch was installed to prevent vandalism and theft.

Considered together, this evidence is legally and factually sufficient to support the jury's finding that Argueta was negligent with respect to the occurrence in question. Based on this evidence, the jury reasonably could have concluded that (1) reasonable measures were not taken to ensure Max did not sit in the emergency exit row, and (2) the bus's emergency exit door did not work properly. Therefore, in accordance with the charge instructions, the jury reasonably could have found that Argueta failed "to use a high degree of care" and did not act as "a very cautious, competent, and prudent person would have done under the same or similar circumstances."

We overrule Argueta's challenge to the jury's negligence finding.

### 2. Proximate Cause

Argueta also argues the evidence does not support the jury's finding that Max's injuries were caused by the school bus incident.

To prevail on a negligence claim, the plaintiff must establish that the defendant's negligence was the proximate cause of his injuries. *Katy Springs &*

*Mfg., Inc. v. Favalora*, 476 S.W.3d 579, 590 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). To establish proximate cause, the plaintiff must prove foreseeability and cause in fact. *Id.* For foreseeability, the plaintiff must show that the defendant should have anticipated the dangers that its negligent act or omission created for others. *Id.* The test for cause in fact is whether the negligent act or omission was a substantial factor in bringing about the injury, without which the harm would not have occurred. *Id.* "Generally, the issue of proximate cause is a question of fact." *Id.*

Turning to the evidence, we begin with a review of the witness testimony addressing the immediate aftermath of the incident before proceeding to discuss the medical experts' testimony regarding Max's injuries and their effects.

According to Jorissen, Max was lying in the street on his back after he fell from the bus. Jorissen said Max was trying to get up and responded "no" when asked if he was hurt. Jorissen recalled carrying Max to the bus; Jorissen said Max was not crying and did not appear seriously injured. Jorissen asked Priscilla to take Max to his great-grandmother's workplace. Jorissen gave Max an icepack and Max placed it on his head. Jorissen recalled seeing scrapes on Max's knees and ankle.

According to Priscilla, she drove to the school bus after receiving Jorissen's call and, upon boarding the bus, saw Max standing in the middle aisle. Priscilla said she did not see that Max had any injuries except for scratches on his knee. Priscilla agreed that Max looked like a "hurt child" who "wanted his mother." Priscilla testified that Max did not appear to be seriously injured and that she did not think it was necessary to call an ambulance.

Priscilla drove Max to his great-grandmother's workplace and walked him inside. Under the lights, Priscilla recalled that she noticed "like maybe a drop of

13

blood on [Max's] forehead." Priscilla told Max's great-grandmother that "maybe [she] need[ed] to seek some medical attention for [Max]." Priscilla said that, the day after the incident, she called Gutierrez to check in on Max because she was "[v]ery concerned" about him.

Max's great-grandmother, Earline Cain, also testified at trial. Cain said that, when Max was dropped off at her workplace, she "could see [Max] had been crying and he was very like upset, zombielike." According to Cain, Priscilla told her that Max "fell off a bus; but it's okay." Cain recalled walking Max back into her office where he started to vomit. Cain carried Max to her car to drive him home; on the way to the house, Cain recalled that she had to pull over so Max could vomit again.

Cain testified that, when she arrived at the house, Max vomited again. Gutierrez arrived at the home shortly thereafter and took Max to the emergency room. From the emergency room, Max was transported via ambulance to a children's hospital. Medical records from the hospital show Max was diagnosed with a closed skull fracture and a subdural hematoma.

Gutierrez presented testimony from three medical experts regarding the extent of and effects from the injuries Max sustained in the incident: Dr. Young (a psychiatrist), Dr. Harrison (a psychologist), and Dr. Axelrad (a neuropsychiatrist). We summarize these experts' testimony below:

Dr. Young:

- Max's skull fracture and brain bleed constitute a "complicated moderate traumatic brain injury."

- Max presently suffers deficits associated with the traumatic brain injury. Specifically, there is "a significant disparity difference between verbal comprehension and the visual/spatial index." This injury makes it difficult for Max "to get it out and to talk and to

14

communicate." With these types of injuries, children "socially . . . don't do so well because they can't talk it up with the other kids as easily."

- "Based on a reasonable medical certainty", this "declarative, spoken, pragmatic interactive communication or language weakness" is likely to have been caused by Max's fall from the bus.

- Dr. Young's "final diagnosis" is "neurocognitive disorder due to traumatic brain injury with a postconcussive syndrome and headaches, sustained on or about September 18, 2014 due to falling out of the school bus."

- Max also exhibits a "disruptive and blunted mood" and is "withdrawn and isolative." Based on his family's description of him before the accident, "[t]here has been a change in personality, in [Max's] emotional presentation."

- Max "cries easily [and] appears depressed." His behavior is "very unusual" and indicative "of apathy or depression or continuing personality change due to the injury or postconcussive syndrome."

- Max has started to see "some dips" in his grades in fourth grade. This is consistent with the injuries he suffered because "the academic demands are greater" in fourth grade than in earlier grades.

Dr. Harrison:

- Max had a normal IQ test but has "a significant difference that you wouldn't ordinarily see between his verbal functioning and his nonverbal functioning." Max scored "significantly lower on things that were verbal in nature, and that was unusual."

- Max's "level of verbal comprehension was not where it should be compared to his overall mental functioning." Max had trouble with "how things fit together and what it means."

- "[B]ased on reasonable psychological probability", the deficiencies identified are attributable to Max's traumatic brain injury.

- Max was "flat in his affect" — "just kind of humorless, bland and flat." He was monotone and unresponsive.

Dr. Axelrad:

- Max has "a mild neurocognitive disorder due to traumatic brain

15

injury" and "some significant problems with his personality functioning and his cognitive functioning."

- Max has a "social cognition" deficit as well as "some problems with social cognition."

- Max "has problems with motor functioning in the context that his play behavior has substantially changed." "He's not as actively involved with his peers as he was before" and is "having significant problems in not wanting to play outside."

- Concluded with a "reasonable medical certainty" that Max "suffers currently from a mild neurocognitive disorder due to traumatic brain injury."

Against this backdrop, Argueta offered testimony and evidence challenging the severity of and the effects from Max's accident. Medical records from a neurology visit approximately one month after the incident indicate that Max "need[ed] no further imaging studies or neurosurgical evaluation." Additionally, in a medical questionnaire completed by Gutierrez approximately three months after the accident, she responded "No" to the following questions: "Does your child show feelings that concern you or seem strange for their age?" and "Does your child often do things that seem strange for their age?" Gutierrez also responded "No" to a question asking if Max had headaches, sleeping problems, frequent stomach aches, or a lack of energy.

In medical records from a March 2016 visit to a neurologist, the doctor concluded that Max's neurological exam was "unremarkable". The doctor's assessment also stated that Max had "no residual symptoms" from the traumatic brain injury. Argueta's counsel also elicited testimony from Dr. Axelrad acknowledging that Max has not received any additional medical treatment in the four years preceding trial.

Finally, Argueta presented expert medical testimony from Dr. Clark, a child

16

neurologist. Dr. Clark testified that Max had a "completely normal neurologic examination." Dr. Clark did not anticipate that Max would have future problems stemming from the incident.

Viewed in the light most favorable to the challenged finding and indulging all reasonable inferences, this evidence is legally sufficient to support the jury's finding that Argueta's negligence caused the claimed injuries. *See City of Keller*, 168 S.W.3d at 822. The evidence shows that Max fell from the bus, was bleeding from the head, and was vomiting before he was taken to the hospital. At the hospital, Max was diagnosed with a skull fracture and a subdural hematoma. Gutierrez's experts opined that, to a reasonable medical probability, these injuries caused Max to have difficulties with verbal comprehension, communication, and social cognition as well as mood changes including apathy and depression.

Likewise, the challenged finding is also supported by factually sufficient evidence. *See Noble Drilling (US) LLC*, 596 S.W.3d at 487. The jury heard testimony and evidence challenging the extent of Max's injuries, including Jorissen's and Priscilla's accounts of the incident, medical records stating that Max's injuries were not severe, and the testimony of Dr. Clark. But this evidence is not so overwhelming as to render evidence in support of the finding factually insufficient. It was within the jury's province to weigh conflicting evidence and to resolve disputed issues of fact, and we decline to disturb that determination on appeal. *See Gunn v. McCoy*, 554 S.W.3d 645, 662-63 (Tex. 2018) (if evidence, including expert testimony, conflicts, "it is normally the province of the jury to determine which evidence to credit").

We overrule Argueta's proximate cause challenge.

17

## C.    Damage Assessments

Argueta challenges the legal and factually sufficiency of the evidence supporting the following damage assessments:

- $300,000 for Max's past physical pain and mental anguish;
- $300,000 for Max's future physical pain and mental anguish;
- $288,000 for Max's future medical expenses from the time of trial until he reaches age 18; and
- $1,000,000 for Max's future medical expenses after the age of 18.

We consider these categories of expenses separately.

### 1.    Physical Pain and Mental Anguish

Under Texas law, damages for mental anguish are recoverable in virtually all personal injury actions, including negligence. *Katy Springs & Mfg., Inc.*, 476 S.W.3d at 594. To support an award of mental anguish damages, the plaintiff must show (1) direct evidence of the nature, duration, or severity of the plaintiff's anguish, thus establishing a substantial disruption in the plaintiff's daily routine, or (2) other evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Patel v. Hussain*, 485 S.W.3d 153, 178 (Tex. App.—Houston [14th Dist.] 2016, no pet.). The plaintiff must demonstrate a reasonable probability that he will suffer compensable mental anguish in the future. *PNS Stores, Inc. v. Munguia*, 484 S.W.3d 503, 517 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

Proof of mental anguish may include "painful emotions such as grief, severe disappointment, indignation, wounded pride, shame, despair, public humiliation, or a combination of any or all of those feelings." *Plasencia v. Burton*, 440 S.W.3d 139, 148 (Tex. App.—Houston [14th Dist.] 2013, no pet.). "Mental anguish also may include the loss of enjoyment of life." *Hussain*, 485 S.W.3d at 178.

18

Plaintiffs also may recover for physical pain. *PNS Stores, Inc.*, 484 S.W.3d at 517. Damages for future physical pain are recoverable if a jury could reasonably infer that the plaintiff will feel physical pain in the future. *Id.*

"The process of awarding damages for amorphous, discretionary injuries such as physical pain and mental anguish is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Id.* at 518; *see also Figueroa v. Davis*, 318 S.W.3d 53, 62 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("The amounts of damages awarded for pain and suffering . . . are necessarily speculative and each case must be judged on its own facts."). "[T]he impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages." *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). But despite this broad discretion, there must be some evidence to justify the amount awarded — juries "cannot simply pick a number and put it in the blank." *Id.*

### *Past Physical Pain and Mental Anguish*

Here, legally and factually sufficient evidence supports the jury's assessment of $300,000 in damages for Max's past physical pain and mental anguish.

Based on the evidence, the jury reasonably could have concluded Max suffered significant pain and distress the day of the incident — feelings likely exacerbated by the fact that Max was only five years old at the time. The evidence showed that Max fell from a moving school bus and hit his head on the pavement. When Max was dropped off at Cain's workplace later that afternoon, he was bleeding from an injury on his head and repeatedly vomited. According to Cain, she "could see [Max] had been crying and he was very like upset, zombielike." Cain recalled that Max continued to vomit until Gutierrez took him to the emergency room, after which he was transferred via ambulance to the hospital.

19

Taken together, this sequence of events would be highly distressing to a five-year-old child.

Other evidence indicated that, post-accident, Max's personality and disposition substantially changed. *See PNS Stores, Inc.*, 484 S.W.3d at 518 (evidence that the plaintiff's "personality has changed for the worse" relevant to sufficiency analysis for mental anguish damages); *Katy Springs & Mfg., Inc.*, 476 S.W.3d at 597 (in mental anguish sufficiency analysis, the court considered evidence of the plaintiff's "attitudinal changes and the attendant hardships"); *see also* Section II.B.2, *supra.*

The testimony from Dr. Young, Dr. Harrison, and Dr. Axelrad comports with that from Gutierrez and Cain regarding Max's personality and disposition after the accident. According to Gutierrez, before the accident Max was outgoing, happy, and "would talk a lot." But after the accident, Gutierrez said Max was no longer outgoing and became "clingy". Gutierrez testified that Max is "emotional", "cries easily", and is more of a loner now. Gutierrez described an incident where Max refused to go on a school field trip and instead chose to stay at school.

According to Cain, Max is "totally different" after the accident. Cain said Max does not play outside as much anymore and spends a lot of time in his room laying down. Cain said Max frequently complains of headaches.

This evidence, taken together, supports the conclusion that Max suffered a high degree of pain and mental distress and underwent a substantial disruption of his daily routine. The evidence also indicates that the distress and disruption were ongoing in the five-year period between the accident and trial. This evidence is legally and factually sufficient to support the jury's $300,000 assessment for past physical pain and mental anguish.

*Future Physical Pain and Mental Anguish*

Likewise, legally and factually sufficient evidence supports the jury's assessment of $300,000 in damages for Max's future physical pain and mental anguish.

Gutierrez's medical experts opined that Max would continue to suffer from the issues described above. Dr. Young recommended that Max receive weekly medical and psychological treatment for his problems and advised that treatment be revisited at "major developmental stages". Similarly, Dr. Axelrad testified that Max will not be able to "cure his brain damage" and recommended that Max receive long-term care from a child psychologist. Dr. Axelrad also testified that, based on changes he observed following the three-year period between his first and second visit with Max, he "fe[lt] stronger that [Max] needs to be under the care of a child psychiatrist." Dr. Harrison opined that Max's cognitive difficulties would manifest more prominently beginning in the fourth grade, when curriculum shifted to a bigger focus on "critical thinking".

The evidence also showed that from the date of the accident through trial, Max's cognitive and emotional issues persisted. From this evidence, the jury reasonably could infer that Max would continue to deal with such issues after trial. Considered in light of other assessments for future physical pain and mental anguish, the jury's award for future physical pain and mental anguish is not excessive. *See, e.g., Turner v. Duggin*, 532 S.W.3d 473, 481-42, 484-46 (Tex. App.—Texarkana 2017, no pet.) (the plaintiff was injured when she was bit on the leg by a dog; appellate court affirmed award of $350,000 for future pain and mental anguish); *PNS Stores, Inc.*, 484 S.W.3d at 508, 517-18 (the plaintiff was injured when he was hit on the head by two bottles of deck wash that fell from a store shelf; appellate court affirmed award of $520,000 for future pain and mental

anguish).  Therefore, the evidence is legally and factually sufficient to support the jury's $300,000 assessment for Max's future physical pain and mental anguish.

We overrule Argueta's challenge to the jury's damage assessments for past and future physical pain and mental anguish.

### 2.    Medical Care Expenses

To recover future medical expenses, a plaintiff must produce evidence showing (1) a reasonable probability that medical expenses will be incurred in the future, and (2) the probable amount of those expenses.  *Gunn v. McCoy*, 489 S.W.3d 75, 112 (Tex. App.—Houston [14th Dist.] 2016), *aff'd*, 554 S.W.3d 645 (Tex. 2018).  Although the preferred method to prove future medical expenses is through expert medical testimony, "no precise evidence is required to support an award for future medical costs."  *Id*.  Like other types of personal injury damages, it is within the jury's sound discretion to determine what amount, if any, to award in future medical expenses.  *Id*.  This standard of review does not mean, however, that a reviewing court will uphold a jury award for future medical expenses when there is no evidence to support the finding.  *Id*.

***Future Medical Expenses from the Time of Trial Until Max Turns 18***

The jury assessed $288,000 for Max's future medical expenses from the time of trial until he turns 18 years old.  At the time of trial, Max was 10 years old.

Dr. Young and Dr. Axelrad provided the following testimony regarding Max's future medical expenses:

Dr. Young:

- Dr. Young recommended that Max participate in psychotherapy and family therapy at major developmental stages:  middle school, junior high, and high school graduation.

- Dr. Young acknowledged he did not know how "sticky [Max's] problems are." Dr. Young did not know whether Max's cognitive and emotional issues would get worse.

- Dr. Young opined that psychotherapy fees can range from $100-300 an hour.

- Dr. Young opined that medication monitoring can cost $200-300 a session.

- In the "[b]est case scenario", Dr. Young said Max would need six to eight treatment sessions. In the "worst case scenario", Max would need treatment "for a couple of years or more."

- With Max's present condition, Dr. Young recommended weekly sessions "for the better part of a year." Dr. Young also opined that Max may need additional treatment if he develops difficulties with "withdrawal, isolation, depression, [and] communication."

Dr. Axelrad:

- Dr. Axelrad recommended that Max be "under the care of a child psychiatrist" for "an indefinite period of time."

- Dr. Axelrad opined that a child psychiatrist's fees on a monthly basis would be $250-300 a session.

- Dr. Axelrad recommended that Max also see "a child psychologist or child therapist . . . every week to 10 day to two weeks." Dr. Axelrad opined that these fees would cost $200 an hour.

- Dr. Axelrad recommended Max meet with a pediatric neurologist to assess Max's headaches.

- If Max was prescribed medications, Dr. Axelrad recommended that those medications be monitored monthly.

This evidence is sufficient to support the jury's assessment of $288,000 in future medical expenses from the time of trial until Max is 18 years old. This amount reasonably could have been predicated on Dr. Young's and Dr. Axelrad's estimates of long-term costs for weekly sessions with a child psychiatrist and a child psychologist as well as medication monitoring for the eight years remaining until Max turns 18 years old.

We overrule Argueta's challenge to the jury's assessment of $288,000 for Max's future medical expenses from the time of trial until he turns 18 years old.

### Future Medical Expenses After Max Turns 18

The jury assessed $1,000,000 for Max's future medical expenses after he turns 18 years old.

However, the only evidence addressing Max's future medical expenses is the testimony from Dr. Young and Dr. Axelrad discussed above. The record does not contain any evidence of future medical expenses that will be incurred after Max is 18 years old. Because the record discloses a complete absence of evidence on this point, the jury's assessment of $1,000,000 for Max's future medical expenses after he turns 18 years old lacks legally sufficient evidence. *See Regal Fin. Co.*, 355 S.W.3d at 603. We sustain Argueta's challenge to this damage assessment.

#### CONCLUSION

We reverse the portion of the trial court's judgment awarding Gutierrez $1,000,000 in damages for Max's future medical expenses after he turns 18 years old and render judgment that Gutierrez take nothing on this category of damages. We affirm the remainder of the judgment.


/s/     Meagan Hassan
       Justice


Panel consists of Chief Justice Christopher and Justices Wise and Hassan.

24